1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF HAWAII

3 MAERSK, INC.,     ) CIVIL NO. 04-00652

4     Plaintiff,  ) (HG/BMK)

5  vs.       )

6 HARTMANN METALS CORPORATION,)

7     Defendants.  )

8 _____)

9

10     DEPOSITION OF HANNI HARTMANN,

11   aka HANS HARTMANN, aka HANS HEIN HARTMANN

12 Taken on behalf of Plaintiff at the Law Offices of

13 Damon Key Leong Kupchak Hastert, Bishop Square,

14 Pauahi Tower, Suite 1600, 1001 Bishop Street,

15 Honolulu, Hawaii  96813, commencing at 9:30 a.m., on

16 November 15th, 2005, pursuant to Notice.

17

18

19

20

21

22

23 BEFORE: PATRICIA ANN CAMPBELL, CSR 108

24     Certified Shorthand Reporter

25     Notary Public, State of Hawaii

Page 26

1  Recycling, I started Hartmann Metals, and the nature
2  of this business, even if it is also part of
3  recycling, is quite different. What I do, started
4  doing, and what I continue doing now is that I buy
5  material, a very small amount here in Hawaii, but
6  more on the mainland and in Europe and sell it to
7  clients and receivers and consumers in China and
8  India and in Asia by and large.
9      Q.     So most of your customers, the people
10  that are buying the metal from you, are located in
11  Asia?
12      A.     A huge amount, that is correct.
13      Q.     What percentage of your customers?
14      A.     At this time, about 80 percent.
15      Q.     Was that always true between 1987 and
16  the present, or has that changed?
17      A.     Oh, it changes. This industry changes
18  fast, rapidly, so what is true today could be old
19  news in six months.
20      Q.     Now, I imagine that ocean transportation
21  is an important part of your business since you
22  began Hartmann Metals Corporation?
23      A.     Yes.
24      Q.     And who over the --
25           Hartmann Metals is now approximately

Page 27

1  twenty years old, is that right --
2      A.     That's correct.
3      Q.     -- 1987 to the present?
4      A.     I think I incorporated in '89, '88 or
5  '89. Maybe '88. After my departure from Honolulu
6  Recycling.
7      Q.     Are you the sole shareholder of Hartmann
8  Metals?
9      A.     Yes.
10      Q.     Do you ever engage in transactions that
11  don't involve the ocean carriage of metal?
12      A.     It can happen.
13      Q.     For instance?
14      A.     It can happen that I do business, let's
15  say, domestically in the United States and ship
16  material from Miami, Florida, to a consumer in
17  Tennessee or in Georgia, and in that case, there is
18  no ocean freight included.
19      Q.     That would be mostly by rail or by
20  truck?
21      A.     That is correct.
22      Q.     What percentage of Hartmann Metals
23  business is that, in other words, non-ocean
24  transportation?
25      A.     A very small amount of my business.

Page 28

1      Q.     And have you always used Maersk for your
2  international transportation, or have you used other
3  companies?
4      A.     We have to use in this extremely
5  competitive business whatever freight carrier we can
6  contract with, so the price -- the cost of freight
7  is an important issue, and secondly, whatever
8  carrier services from destination A to destination
9  B, so what I am saying is some carriers do not
10  service certain countries or certain harbors, so we
11  have to go with whoever is available to offer in
12  selling services as ocean carrier.
13      Q.     When did you begin using Maersk?
14      A.     I believe I started with Maersk in 2002,
15  2003.
16      Q.     Prior to using Maersk in 2002 or 2003,
17  who did you use for your ocean carriage to Asia?
18      A.     At that time, there was available here
19  from Hawaii NYK, which is a Japanese company which
20  we still use. In addition, we used Sealand. At
21  that time, they were not associated with Maersk. We
22  used also P and O Lines, and in addition a bunch of
23  other international carriers who offer service from
24  Europe to Asia.
25           Is there coffee in that machine?

Page 29

1           MR. KUGLE: Off the record.
2           (Discussion off the record.)
3      Q.     (By Mr. Kugle) Starting in 2002 or 2003
4  when you began using Maersk, well, let me step back.
5  Which year was it? That's probably important.
6           THE WITNESS: On that list I believe we
7  started 2002, right, on that list?
8           MS. FARIAS: You want to see the --
9           THE WITNESS: Yes.
10           MS. FARIAS: He wants to look at this.
11      A.     This has kind of a summary of
12  activities, and that's a pretty good indicator on
13  when we started.
14           MS. FARIAS: I am just going to identify
15  the document that Mr. Hartmann is looking at. That
16  is a memorandum from Dora --
17           THE WITNESS: Matsumura.
18           MS. FARIAS: -- Matsumura dated June
19  2nd, 2004, showing the invoices received and payment
20  sent.
21           MR. KUGLE: This is an e-mail?
22           MS. FARIAS: E-mail memorandum from Dora
23  to N A M F R C C O L F R T at Maersk.
24           THE WITNESS: Yeah, that's Maersk.
25      Q.     (By Mr. Kugle) Mr. Hartmann, let me

8 (Pages 26 to 29)

Page 62

1  which went to Lee or to Jade originated from the Big
2  Island. That was one particular merchandise.
3      Q.   Was there something that was being
4  dismantled or cleared out or something over there
5  that was generating all of this scrap metal?
6      A.   Your question is --
7      Q.   On the Big Island --
8      A.   Yeah.
9      Q.   -- was somebody doing something that was
10 resulting in a lot of scrap metal being generated
11 and sold?
12     A.   That is correct. I bought the material
13 from a company which has a contract with the county
14 of the Big Island, and they generate this type of
15 material which I marketed as trader broker to, in
16 this case, China.
17     Q.   And what was the name of the company on
18 the Big Island that you were dealing with?
19     A.   Big Island Scrap Metal.
20         MR. KUGLE: Okay, let's have this marked
21 as Exhibit Number 3.
22         (Deposition Exhibit 3 was marked for
23         identification.)
24         THE WITNESS: That's the same, but what
25 is the difference between Exhibit Number 1?

Page 63

1      Q.   (By Mr. Kugle) Well, that's what I was
2  going to ask you. First let me ask you, have you
3  seen Exhibit Number 3 before?
4      A.   Possible.
5      Q.   Do you recognize any of the handwriting
6  on Exhibit 3?
7      A.   Not really.
8      Q.   That's not yours?
9      A.   No, that's not mine. My handwriting is
10 much worse.
11     Q.   Now, this is a memo that's dated April
12 5, 2004. Does this look like something that you
13 would have asked Dora Matsumura to prepare?
14     A.   Yeah, okay, yeah, I just see it here.
15 It went to Andrea Jinks, Maersk, somewhere in South
16 Carolina. Because at that time we had a dispute or
17 whatever, they needed information, and I simply
18 turned it over to Dora and said supply all the
19 information which we have, what we received and what
20 we paid. So I did not coach or manage Dora. I
21 simply asked her just supply to Maersk what we have.
22         I remember this lady, Andrea Jinks.
23 Dora spent quite a lot of time with her. She is
24 somehow in bookkeeping accounts receivable, and at
25 that time already we learned with amazement, excuse

Page 64

1  my French, but how screwed up the Maersk bookkeeping
2  was, and Dora actually coached this Andrea Jinks
3  through the steps and what happened, and I remember
4  that very clearly. Dora was amazed at how confused
5  Maersk bookkeeping in Carolina was and guided her,
6  walked her through the procedures. And I relied
7  completely on Dora because in bookkeeping I am a
8  bloody amateur.
9      Q.   All right. In other words, you asked
10 Dora to prepare this list to resolve the differences
11 with Maersk to provide all the information that
12 Hartmann Metals had, and then you left the ball in
13 Dora's court?
14     A.   I asked Dora to execute, basically, the
15 requests from Maersk and help to straighten out any
16 confusion and any differences, and I paid Dora a lot
17 of money to do this for the sake of all of us
18 because I wanted to have that somehow cleared and
19 straightened out. Dora acted only on my requests
20 and orders and instructions, but not on her own.
21     Q.   Okay. Now, I see on the second page of
22 this somebody wrote in handwriting cc Hartmann
23 Metals Corporation. Do you remember receiving a
24 copy of this in that time frame?
25     A.   Since I see here that she cc'd, it

Page 65

1  probably came from Dora, and it's probably very
2  reasonable to assume that I received it, but I don't
3  recall it.
4      Q.   Okay, and you have no idea whose
5  handwriting that is on the first or second page?
6      A.   No.
7      Q.   When you received a copy of this, did
8  you do anything with it, or did you file it away?
9      A.   Mostly I filed it away.
10     Q.   Did you have any discussions with Dora
11 after she prepared either Exhibit 3 or Exhibit 1,
12 the other list that we just looked at?
13     A.   Dora came back and reported to me and
14 told me what she did, that she tried to straighten
15 it out, that she guided this Andrea Jinks. She even
16 told me at some time this was kind of amazing that
17 Andrea Jinks released to Dora that, oh, yeah, here
18 are payments or credits which she did not show, so
19 which was more evidence that the accounting system
20 over there in South Carolina is disastrous, and then
21 surprisingly after Dora received that piece of very
22 important information, this Andrea Jinks was nowhere
23 to be seen to be contacted. She was taken off the
24 case, I guess. We never could contact Andrea Jinks.
25 Somebody else took over handling this account.

17 (Pages 62 to 65)

Page 66

1 Since I see that name, it pops up in my
2 recollection.
3    Q.    Okay.  On the second page of Exhibit 3,
4 Dora Matsumura writes I will suggest to Mr. Hartmann
5 that he should release payment of $18,875.36 to
6 clear this account.
7    A.    Yes.
8    Q.    Do you see that, Mr. Hartmann?
9    A.    Yes, I do.
10    Q.    Do you recall having a discussion with
11 Dora about whether you should make that payment?
12    A.    Yes, I did.
13    Q.    And you did in fact attempt to make that
14 payment; is that correct?
15    A.    I did not only attempt it.  I sent a
16 check or a wire transfer of that very same amount to
17 Maersk because this is also evidence of how much I
18 trust Dora and her fine work.  She figured out for
19 me, Mr. Hartmann, you owe 18, almost $19,000.  I
20 said, oh, bad, but if I owe it, if you tell me, then
21 I guess I have to pay it, so I made that payment to
22 Maersk.
23    Q.    And do you recall whether that was by
24 check or by wire transfer?
25    A.    I believe that was a wire transfer as

Page 67

1 well because I started -- yes, it was wire
2 transferred on April the 9th, '04, which
3 incidentally this memo dates April 5, so four days
4 later I wired that amount to clear the account.
5    Q.    And was that money ever sent back to
6 you?
7    A.    Yes, it was.
8    Q.    And what were you told at that time when
9 the money came back to you?
10    A.    I just had two weeks later or three
11 weeks later an envelope in the mail with a check
12 made from Maersk, not my own check, a check from
13 Maersk for that very same amount, and I called
14 Maersk here in Honolulu in my eternal search to be
15 able to talk to somebody who can give me an
16 intelligent answer.  What do I do now with this
17 check?  The usual answer, we don't know.  We have no
18 idea.
19    Q.    And who was that conversation with?
20    A.    I usually had these conversations with
21 Ms. Pam Lake of Maersk here in Honolulu.  I had
22 endless meetings and negotiations with her, to a
23 lesser degree with Carlos Sullivan, and I also had
24 some conversation with some staff, Maersk staff or
25 Sealand staff in Sand Island.  I don't recall the

Page 68

1 names.  They are somewhere in my files.
2    Q.    Okay.
3    A.    This was part of my ordeal, not only
4 about this check trying -- in previous conversations
5 trying to talk with somebody at Maersk, please
6 understand, trying to solve some of these problems.
7 I had to talk to Maersk Honolulu, that makes sense.
8 I had to talk to Maersk in Houston.  They have some
9 kind of an office handling freight matters.  I
10 talked to Maersk in Carolina that does bookkeeping.
11 I talked to Maersk in China in Shanghai, to Maersk
12 in Chennai, and to, believe it or not, Maersk in
13 Costa Rica.  They were responsible for freight
14 rates.
15         So I had sometimes in e-mails a list of
16 six or seven hidden e-mail addresses which I never
17 could identify.  Like this one case here NAMF, they
18 have a Maersk internal lingo worldwide, so I never
19 could focus who are you?  I sometimes asked who is
20 talking to me because they sent e-mails without
21 saying, dear Mr. Hartmann, best regards, Pam Lake.
22 It was just a block of information even in some kind
23 of a company related lingo, partially English,
24 partially whatever, so I was lost in orbit trying to
25 find people to help me talk to somebody.

Page 69

1    Q.    Now, did Dora ever explain to you what
2 any of the handwritten notations meant on Exhibit 3?
3    A.    No.  Are these Dora's notes?
4    Q.    I'm not sure.  I am asking you.
5    A.    I have no idea.  I think I said earlier
6 I do not recognize whose handwritten notes these
7 are.
8    Q.    Now, I am going to ask you to look back
9 at Exhibit 1.  At the conclusion of the list, Dora
10 then makes some statements beginning at the very
11 bottom of the first page and proceeding to the
12 second.  She says Hartmann Metals will not be
13 responsible to, for the storage and change of
14 destination fees for invoices that OBL was not
15 received on time, and she goes on to say some other
16 things, but is that her position or your position?
17    A.    That's my position.
18    Q.    Okay, so you told Dora there are certain
19 things that might not be on this list that we are
20 just not willing to pay?
21    A.    No.
22    Q.    Is that what Dora was communicating --
23    A.    No.
24    Q.    -- to Maersk?
25    A.    No.  Dora knew from me that -- yeah,

18 (Pages 66 to 69)

Page 70

1  just to clarify again our general agreement with
2  Maersk, meaning basically with Pam Lake and with the
3  clients in Hong Kong, that, sure, we did our
4  responsibility, we followed our responsibility, we
5  paid the ocean freight. Whatever the client over
6  there in China wanted to do, diversion and possible
7  demurrage which we have no knowledge of -- maybe at
8  that time we had knowledge of it, I don't know, but
9  I made it clear to Dora, Dora, look, we pay whatever
10 we have to pay, the freight what we agreed upon, but
11 we did not agree that we pay for the diversion or
12 demurrage because that is supposed to be paid over
13 there in China, so Dora wrote this only after my
14 instructions to that understanding.
15     Q.    Okay. Now, you talked about the general
16 agreement with Maersk and Pam Lake, and you have
17 said that this agreement was that Hartmann Metals
18 would pay the freight, and then the consignee was
19 responsible for whatever occurred over in China?
20     A.    That was the whole understanding which
21 triggered possible diversion and demurrage on some
22 of these shipments.
23     Q.    Is that put in writing anywhere?
24     A.    Should be somewhere in the mountain of
25 correspondence which went back and forth.

Page 71

1      Q.    Well, what I am trying to get out is did
2  you ever sit down with Pam Lake, come up with a
3  contract that spells that out and sign it, something
4  like that?
5      A.    That is usually not done that we write a
6  contract. That would be even more administrative
7  headache. As I said earlier, we negotiate a freight
8  rate for a specific amount of containers. It could
9  be one, it could be fifty, and then we ship
10 accordingly, and we pay accordingly, but you usually
11 don't execute and exchange contracts for these
12 transactions. You may and you usually confirm it in
13 the form of an e-mail, but you don't sign it.
14     Q.    Okay. So in other words, if it's in
15 writing, then, it might be in a series of e-mails or
16 letters rather than something that was created at
17 the beginning of your relationship?
18     A.    That is correct. Contracts are usually
19 in our business only executed when I buy material
20 and when I sell the material. Then we execute a
21 rather simple form of contract just to be on record
22 and have a document.
23     Q.    So, for instance, if you have a seller
24 in Hong Kong, I mean, I'm sorry, a buyer in Hong
25 Kong, and you are communicating with them, you might

Page 72

1  reference contract 365 or something like that?
2      A.    That's correct.
3      Q.    And contract 365 would be a written
4  contract between you and your customer in Asia?
5      A.    That is usually how we execute our
6  business, that is correct.
7      Q.    You know, I didn't see in any of the
8  documents that were produced to us any contracts
9  like that between you and your customers in Asia.
10     A.    Because that is not relevant for the
11 business which I have with Maersk.
12     Q.    Do you still have those contracts?
13     A.    Basically, I should have these
14 contracts, yes.
15     Q.    Would these contracts spell out between
16 you and your customer in Hong Kong who is responsible for what
17 portion of the transportation expenses?
18     A.    Somewhat, yes, because when I make a
19 sale to somebody in Hong Kong, I usually make a sale
20 cost per dollars per ton, and now here comes the
21 important phrase, like C and F Shanghai. C and F is
22 a worldwide well-known abbreviation for cargo and
23 freight, C and F or another -- just for the sake of
24 completion, another abbreviation would be CIF. Then
25 we as seller and shipper are responsible for the

Page 73

1  cargo, for the merchandise, the scrap; I is
2  insurance, and we have to insure the merchandise;
3  and F, freight which we booked with Maersk.
4          That understands that we deliver that
5  merchandise on a C and F or CIF basis to Shanghai,
6  and that also understands that receiver usually has
7  seven or ten or fourteen days free detention time,
8  and if he exceeds that time, he is responsible for
9  it. These are rules in the international trade
10 which are known and don't have to be specifically
11 spelled out.
12     Q.    So in other words, if you have an
13 abbreviation, your contract says CIF or C and F, you
14 and your contractual partners in Asia will
15 understand what that means and who is responsible
16 for what?
17     A.    That's correct.
18     Q.    Those are terms of art or terms in the
19 industry?
20     A.    Yes, that's correct.
21     Q.    Now, do you provide Maersk with copies
22 of your contracts with your partners in Asia?
23     A.    No, that is not necessary.
24     Q.    So in other words, regardless of what
25 your agreement is with your partner in Asia about

Ralph Rosenberg Court Reporters, Inc.
2460 American Savings Bank, 1001 Bishop Street

Page 74

1  who's going to pay what portion of freight or free
2  time or anything else, Maersk doesn't know that?
3      A.    Repeat that question, please.
4          MR. KUGLE: Could you read that question
5  back?
6          (The question was read back by the court
7          reporter.)
8      A.    Maersk knows that I am responsible for
9  the freight because I chartered and made a booking,
10 and the conditions of this booking with Maersk
11 covers and matches my corresponding sale. If it
12 does not match, then we have a problem. If it
13 matches, which is normally the way things are done,
14 then my agreement with Maersk and my understanding
15 with Maersk and my agreement and contract and
16 understanding with the receiver fit.
17         So Maersk does know, okay, Hartmann
18 ships ten containers. It is understood, let's say
19 for the sake of it, they have ten days free time,
20 and my receiver knows that as well. Sometimes
21 receiver comes and says can you give us 21 days?
22 That does happen. But let's say Maersk gives us ten
23 days, receiver knows he has ten days to pull the
24 containers from Maersk in Shanghai, unload them and
25 return the containers. So this is the day-to-day

Page 75

1  procedure.
2      Q.    (By Mr. Kugle) Okay, and your buyer
3  knows that because that's in your agreement with the
4  buyer?
5      A.    Yeah.
6      Q.    Okay. I guess in explaining how your
7  business works, I just want to be clear that there
8  will be instances, in fact, it could be routine that
9  at the time you are putting cargo on to a vessel or
10 making a booking, Maersk has no idea who your
11 customer is?
12     A.    Yes and no. Maersk certainly knows as
13 part of my booking who the shipper is, who the
14 consignee is, and who the notifying party is.
15 Maersk has to know that because these are very
16 crucial data which have to appear on the OBL. The
17 OBL is a very, very crucial instrument. However, it
18 is possible that my contractual partner could be
19 another party, but at least Maersk is very well
20 aware of the three entities: Shipper, notifying
21 party, and consignee, including full address,
22 including telephone number, including fax number,
23 and possibly even including a contact address at the
24 receiving end.
25     Q.    But wasn't it also fairly common in your

Page 76

1  dealings with Maersk that some of those identities,
2  the consignee or the notifying party, would change
3  before the cargo was delivered in Asia?
4      A.    This is an educated assumption from my
5  end. Probably not because if the data which I
6  supplied to Maersk, they still stand. If my buyer
7  changes the cargo to somebody else, then they have
8  to feed that information to the Maersk people in
9  China or Shanghai, whatever it is, so Maersk will
10 only learn about another consignee if that happens
11 when it will be replaced with the original existing
12 one which came from me, and it came from me because
13 my buyer gave that information to us, and I
14 forwarded it Maersk.
15     Q.    Right, and so whenever one of these
16 persons --
17         It's going to be you, Hartmann Metals,
18 that has to go back and tell Maersk there's been a
19 change, put in a different party, a different
20 notifying party, a different address, that
21 information has to come from you because they
22 wouldn't -- presumably they wouldn't trust somebody
23 calling out of the blue in Asia?
24     A.    To my recollection, we never changed the
25 consignee or the notifying party. We only changed

Page 77

1  as per request from Hong Kong destination.
2      Q.    And when you say request from Hong Kong,
3  you are talking about --
4      A.    My buyer.
5      Q.    -- your buyer?
6      A.    Yes.
7      Q.    Okay.
8      A.    Yeah, I am almost certain that we never
9  -- we just forwarded the request, okay, don't go to
10 Shanghai. The ship is still on it's way to
11 Shanghai. We would like to have the material go to
12 Chennai. All right, okay. Then we are the conduit
13 because we are the shipper on record. That's what
14 Maersk advised him, we can not take your order even
15 if you are the buyer, even if you pay for the
16 material, even if you show us original bill of
17 ladings now which came from me. So he is now really
18 the legal owner of the merchandise coming to
19 Shanghai. No, this is bureaucracy, but this is the
20 way it is. No shipper on record, Hartmann, has to
21 give us instructions to forward the merchandise.
22         So we did, and then we got caught
23 because obviously something funny happened over
24 there in China. The additional fees, diversion fees
25 and demurrages which were supposed to be paid by

20 (Pages 74 to 77)

Page 78

1   Hong Kong probably did not get paid or did not get
2   paid at all. That's why Maersk came back and said,
3   Mr. Hartmann, we have something to collect.
4        Q.    Okay, and we will get into those
5   specifics.
6        A.    Yes.
7        Q.    You did just mention that the buyer was
8   supposed to pay the charges in China, and, again,
9   that requirement that the buyer pay the charges in
10  China was one that's found in your contracts with
11  your buyer; is that right?
12       A.    That was actually not -- no, that was
13  not part of the contract. When we executed the
14  contract, that stipulated, let's say, C and F
15  Shanghai, as an example.
16       Q.    Okay.
17       A.    The cargo was now on its way on the ship
18  somewhere about Fiji, I don't know, and now the
19  receiver requested a detouring or a change of
20  directions. While we already did everything what we
21  were supposed to do under our contract, we probably
22  even already received our money, and now they came
23  and changed it because if they would have changed it
24  prior to sailing, we would have given the proper and
25  new information to Maersk in the first place. So

Page 79

1   the information came eventually from our buyer in
2   China, and, again, I only can repeat it with the
3   clear understanding, yes, it will cost some more
4   money because we are asking Maersk not to drop in
5   Shanghai but to go to Chennai. We will pay for
6   that. That's why I had no reason to not honor this
7   request.
8            If they would have said, well, Hanni,
9   no, ship it to another port, I would have said,
10  well, who pays for that expense? I would have
11  jumped up and down like a kangaroo and said I am not
12  going to pay for that. I did what I was supposed to
13  do. If you want to take this material now to
14  Moscow, be my guest.
15       Q.    Okay, and how did these conversations
16  between you and your buyer occur? Was it by
17  telephone, by e-mail, by letter, by fax?
18       A.    Usually by e-mail and telephone.
19       Q.    Who was the person that you were dealing
20  with by e-mail and telephone?
21       A.    The person in Hong Kong?
22       Q.    Yes.
23       A.    His name is Mr. Justin Chu, C H U. He
24  was the principal man over there to negotiate the
25  deals.

Page 80

1        Q.    On behalf of the buyer?
2        A.    Well, he was the buyer.
3        Q.    Okay.
4        A.    He bought. He was buying for either Lee
5   Cheung or for Jade. He was the point man, so to
6   speak, for me.
7        Q.    And there were specific instances where
8   there was a diversion like the one you just
9   described in which you then went back to Mr. Chu and
10  said, fine, we will facilitate the diversion, but
11  paying for it is your responsibility?
12       A.    That was the principal, general, major,
13  monster, elephant understanding. Otherwise, it
14  would be idiotic for me to even consider something
15  different.
16       Q.    Among the documents that Hartmann Metals
17  produced, I didn't see any e-mails or notes or
18  communications in writing of any kind related to
19  your communications with your buyer in Asia about
20  who was to pay what.
21       A.    That could be a problem that we may not
22  have these corresponding e-mails on record any more
23  because I never imagined that something what
24  happened can happen.
25       Q.    At the time that you were having these

Page 81

1   conversations with your partner in China about who
2   was to pay what part of the freight, and by freight
3   I actually mean -- let me be clear. In this
4   instance, I am talking about both freight and
5   demurrage, all the money that is owed to Maersk for
6   the transportation. At the time that you and your
7   contractual partner in China are having these
8   discussions and negotiations, are these
9   communications being provided to Maersk also?
10       A.    Apparently, there must have been a huge
11  amount of communication between China and Maersk
12  China. There were apparently heavy discussions and
13  negotiations because the cargo eventually was
14  discharged in whatever port, and we didn't hear from
15  these very cargos weeks after -- weeks later, so we
16  must have had the assumption, okay, we knew the
17  cargo arrived, let's say, on January the 31st, and
18  we haven't heard anything in February or in March,
19  so everything is hunky dory because the cargo was
20  even diverted. The additional cost must have been
21  paid.
22            Otherwise, Maersk would have come back
23  to us and said your containers are stuck in either
24  Chennai or Shanghai or somewhere because there are
25  some costs still to be paid. Maersk did not come to

21 (Pages 78 to 81)

Page 90

1  pay as soon as possible, otherwise, I will not be
2  able to trade my payment for the original bill of
3  lading.
4      Q.    And if you don't hold the original bill
5  of lading, then you can't fulfill your contract with
6  your buyer in Asia because they need that?
7      A.    Correct.
8      Q.    So, again, I guess for me to understand
9  your business, the key to your business is your
10  ability to obtain an original bill of lading and
11  convey that to your buyer in China because that
12  shows that you have passed title to them, and they
13  get the goods, and you get paid?
14      A.    And in addition to what you said which
15  is correct, in addition, now the transfer of the OBL
16  which I have received from Maersk which I express
17  mailed to China, they can now go in Shanghai to
18  Maersk and collect these containers from Maersk when
19  the vessel arrives to take possession of their
20  cargo.
21      Q.    Okay. So your buyer has the three
22  originals, and they walk up to the door at Maersk,
23  and they say, I am the owner, I have got the three
24  originals, and release it to me?
25      A.    That's in essence correct, yes.

Page 91

1      Q.    Okay. Let me have you look, instead of
2  at Exhibit 1, take a look at Exhibit 3 which is the
3  earlier memo by Dora, and I see the same invoice and
4  the same date there, but she has got some
5  handwriting which looks like the original invoice
6  amount, $8,579.81, written next to the typed amount
7  of 8,565. Do you see that?
8      A.    I see that.
9          MS. FARIAS: Okay, I would like to
10  object, just interject an objection. We don't know
11  that that is Dora's handwriting. We don't know
12  whose handwriting it is.
13      Q.    (By Mr. Kugle) Fair enough. Somebody
14  has written the --
15      A.    Numbers.
16      Q.    That's correct. Mr. Hartmann, can you
17  tell me whether Exhibit 3 came from your files or
18  from Maersk's files?
19      A.    I do not know.
20      Q.    Okay. Well, I will represent to you
21  that this was produced by Hartmann Metals Company in
22  the course of discovery, but we will try to figure
23  out whose handwriting it is. I understand that you
24  have not confirmed whose it is.
25          Does the handwritten notation of the

Page 92

1  original amount, does that help, does that explain
2  to you or refresh your recollection about why there
3  is a discrepancy between the two sums of about
4  $14.81?
5      A.    No, but I can tell you that we did have
6  during the course of this business at times
7  variations that bill of ladings showed an amount
8  which was incorrect, and we paid what we felt is the
9  correct amount, which certainly adds to the
10  confusion which we have here, so we have a whole
11  ball of wool tangled up, and that I do recall that
12  very, very clearly that some of the invoice amounts
13  did not correspond to what we negotiated and agreed
14  upon, like I explained that earlier. However, here
15  I can not explain why there is a difference of
16  $14.81.
17      Q.    Okay. Looking at Exhibit 4, I see a
18  list of charges under the freight and charges, and I
19  don't see anywhere $14.81 cents, but I do see 115
20  Hong Kong dollars. Do you follow where I am
21  looking?
22      A.    Yes.
23      Q.    Do you have any understanding about
24  whether that Hong Kong dollar origin dock fee is
25  something that you would pay or that you would take

Page 93

1  issue with?
2      A.    This is part of my responsibility, even
3  if it shows here in Hong Kong dollars, but it is
4  usually then converted into US dollars which we
5  paid, so that's reflected in the total amount of
6  8579, and that may be a reason why there's a rather
7  modest difference of $14. What is important to us
8  is what is my cost, which is obviously the basic
9  freight and the big amounts. Some smaller fees like
10  $25 and even $115 are sometimes not completely
11  precisely to the penny determined, but that is
12  negligible. Like $14 doesn't make so much
13  difference on a freight bill of $8,600.
14          What it shows on this bill of lading,
15  it's all in the column prepaid, this is my
16  responsibilities. Under the column collect which we
17  do not show anything here, that is to be paid by
18  receiver, and on other bill of ladings, not on
19  exhibition here, on others you will find costs
20  spelled out under the column collect, so they have
21  to be paid by receiver.
22      Q.    Okay, and so my understanding and your
23  understanding is correct, when I read prepaid
24  freight or the term prepaid freight, does that mean
25  that you have already paid it?

24 (Pages 90 to 93)

Page 94

1    A.    The term prepaid could be misleading as
2 such that physically I did not pay the freight
3 before the cargo is on board of the ship, but it
4 definitely means before the cargo is discharged in
5 China, so prepaid could very well mean the cargo has
6 sailed, is 24 hours on the water, and then I paid.
7    Q.    What this says, let me make sure that
8 you and I understand the right terms, freight
9 prepaid, the explanation that you gave me when it
10 appears in that box under prepaid, that is your
11 obligation as the shipper whereas if it was freight
12 collect, if it appeared in the other box, then it's
13 your understanding that that's the responsibility of
14 the consignee, the receiver of the cargo?
15    A.    The recipient, yeah --
16    Q.    Okay.
17    A.    -- which could be the consignee, that is
18 correct.  Prepaid is maybe better to be understood
19 when the cargo arrives, the freight is now prepaid.
20 That may explain it a little bit more precisely.
21    Q.    It is now just before noon, and we have
22 been going for close to an hour and fifteen minutes,
23 hour twenty, so why don't we break for lunch?  Off
24 the record.
25         (Noon recess was taken.)

Page 95

1         MR. KUGLE:  All right, let's go back on
2 the record.
3    Q.    (By Mr. Kugle)  Mr. Hartmann, we are
4 back on the record now, and you understand that you
5 are still sworn under oath?
6    A.    I thought lunch deleted that.
7    Q.    And that's a joke?
8    A.    Yes.
9    Q.    Okay, because she can't take down the
10 fact that we are all laughing about that, and I
11 don't want to swear you again.
12         MS. FARIAS:  Ha, ha, ha, ha.
13    Q.    (By Mr. Kugle)  Before we get back into
14 our questions, earlier you testified about a number
15 of communications and contracts with your customers
16 that set out the terms of the payment of Maersk's
17 charges as between Hartmann Metals and its customers
18 in Asia, and I had mentioned to you that I did not
19 see many of those documents produced, if any.
20         MR. KUGLE:  So Cynthia, one of the
21 things before we go further is I went back and
22 checked our document production request which was
23 served in May of 2005 or I should say your response
24 was served in May of 2005.  One of the things that
25 we asked for was all documents relating to any

Page 96

1 agreement between Hartmann and anybody including
2 Jade Alliance, Lee Cheung, Ningbo Long Chain Metal
3 Industry, David Chiao, Sing Fung Trading, and a
4 number of others, and the response was that those
5 had been produced or were in Maersk's possession.
6         Mr. Hartmann confirmed that we don't
7 have a lot of that information, and I think it is
8 material to the claims here, at least insofar as it
9 sets out Hartmann Metals' position about between
10 they and their contractual partners in Asia who is
11 supposed to pay what, and so I would request again
12 that that information be produced and reserve my
13 right to question Mr. Hartmann about those
14 documents, if and when they are produced, because I
15 think that they are relevant.
16         MS. FARIAS:  Well, I think that
17 Mr. Hartmann has testified and testified today about
18 the agreements between Hartmann Metals and the
19 contracting parties.  I don't see a need for --
20 well, it's a burdensome request, and I don't see a
21 need for Hartmann Metals to have to produce the
22 contracts, and it's also proprietary and
23 confidential.  In addition, you know, we are only
24 one party to the contract.  I mean, we can not
25 without permission from the other side produce

Page 97

1 contracts, and I don't think that that would be
2 acceptable in the business.
3         So, you know, if you can show a need for
4 the documentation, I don't know.  It's a rather
5 attenuated issue to be investigating because you
6 have your bill of lading and the shipper's
7 obligations is set out on the bill of lading, so,
8 you know, I don't know what else you may need the
9 inquiry for.
10         MR. KUGLE:  Well, I disagree with
11 everything you say, and I understand that that's the
12 argument that you make, and I would say that they
13 are untimely because they weren't in your response,
14 and I am hearing them for the first time today, and
15 we reserve all of our rights to argue about these
16 things in the future, as we will.  We will take that
17 up if you are still refusing to produce these
18 things.
19         I think you also said that the shipper's
20 allegations are set forth in the bills of lading,
21 and if that's an admission that the terms are set
22 out on the bill of lading including the payment
23 allegations are Hartmann Metals, then perhaps we
24 don't need look at those things, but I don't think
25 he is agreeing that he owes the money that's set out

Page 110

1  cargo was in transit, and then again, this is a fee
2  which as per understanding between Hong Kong,
3  Hartmann, and Pam Lake, Maersk, to be borne in
4  China. That's why there's a huge discrepancy from
5  the original amount of $17,000 shown on that bill of
6  lading, and now we are popping up here at 41,000, so
7  we have an increase here of $23,000 right here on
8  one bill of lading. This is a major reason why we
9  are talking now.
10     Q.    Do you have any recollection right now
11  about the seven containers that were going from Hilo
12  to somewhere in Asia right about New Year's time of
13  2004? And I had suggested to you that there were
14  changes of destination. Do you remember that that
15  kind of transaction took place?
16     A.    That seven containers to be shipped from
17  Hilo in that period of time?
18     Q.    Correct.
19     A.    That is correct, yeah, that is very
20  likely one of the shipments which we have executed
21  under these several contracts which I had exercised
22  with Hong Kong.
23     Q.    Now, this has a notify party of Sing
24  Fung Trading Company. Is that your contractual
25  partner in Asia?

Page 111

1     A.    As I said earlier, my contractual
2  partner with these shipments either was Lee Cheung
3  or Jade Alliance, and also as I explained earlier,
4  the fact that the consignee or notifying party is an
5  entity not known to me is not unusual.
6     Q.    Where would Maersk get this information
7  that's filled out in these boxes, in other words,
8  the consignee box, the notify party box?
9     A.    That information comes from Hartmann
10  Metals. We convey that information from our client
11  buyer.
12     Q.    So when you said the fact that the
13  notify party, in this case Sing Fung, might not be
14  somebody known to you, you get that name from the
15  person that you are contracting with in Asia, they
16  tell you put Sing Fung as the notify party, and then
17  you tell Maersk that; is that right?
18     A.    That is correct.
19     Q.    And in other instances, you might have
20  that consignee box. What does to order mean?
21     A.    That refers to the notify party and
22  consignee are identical, same people.
23     Q.    Okay. So in other situations, there
24  might be somebody else's name in the consignee box?
25     A.    That is correct, or to order could also

Page 112

1  mean if my buyer -- I mean, I don't want to confuse
2  you now with too many of these hundreds of details,
3  but my buyer may finance a purchase from Hartmann
4  Metals with the bank, so to order could mean to his
5  bank so that the bank takes that as collateral.
6  Once they receive the original bill of lading, you,
7  my buyer, the bank is now owner of the property, so
8  this is not unusual that the bank takes security.
9     Q.    Okay, we might come back to Exhibit
10  Number 5, but for right now I want to move on to
11  another one which I think is part of that, and you
12  can explain it to me.
13     A.    May I make one more remark? This is --
14  I can not say if I have seen this copy of this
15  document now for the first time, but this explains
16  here very well why we have here a large discrepancy
17  between original cost per containers and now what
18  eventually was generated by Maersk after a huge
19  amount of costs have incurred, so this was not a
20  document which came to me for payment because I
21  would have jumped through the roof when they hit me
22  with $41,000 because it was not agreed, negotiated,
23  and as you correctly stated, these costs,
24  administration fee, and import demurrage were not
25  even known at the time when I paid for the OBLs to

Page 113

1  get the documents.
2     Q.    But these do appear all in the freight
3  prepaid column. In other words, even the total
4  number 4,000 -- I'm sorry. $41,734.09 is all
5  prepaid which means, as I understood it, that the
6  shipper, Hartmann Metals, is supposed to be
7  responsible for that?
8     A.    Not correct, sir. In the column
9  prepaid, everything but the two last lines -- well,
10  the next to the last line, administrative fee $100
11  per container, that could be my responsibility, but
12  certainly the change of destination fee, which pops
13  up here as I believe $200, is not one of the costs
14  which was understood to be paid by Hartmann Metals,
15  and that's why we arrived at the agreed upon amount
16  of $17,000. This is my responsibility. That's what
17  I paid.
18     But the difference from 17 to 41 does
19  not appear in the prepaid with the exception of the
20  $200, and the huge amount of, I guess, import
21  demurrage, whatever that computes to, that should
22  appear in the column collect. I don't see it here
23  on this copy. I don't see it in the prepaid column.
24  I don't see it in the collect copy. It only pops up
25  in the total summary.

29 (Pages 110 to 113)

Page 118

1  the lower right-hand corner H 18.
2      A.    Yes.
3      Q.    That is not your handwriting; is that
4  correct?
5      A.    That is not my handwriting.
6      Q.    Do you know whether your attorney put
7  that on?
8      A.    I don't know.
9      Q.    Okay.  Immediately above that in
10 handwriting is the statement faxed one dash seven
11 Jade.
12     A.    Right.
13     Q.    Do you see that?
14     A.    Yes.
15     Q.    Is that your handwriting?
16     A.    That's my handwriting, yes.
17     Q.    I will ask you about that in a minute.
18 As you move up the document, midway on the
19 right-hand side, I think you just referred to
20 another handwritten which is some numbers.  Can you
21 read to me what that says?
22     A.    You refer to this writing?
23     Q.    I do, yes.  It looks like it is $87 and
24 something.  That's your handwriting; is that
25 correct?

Page 119

1      A.    That's correct.
2      Q.    Okay, and what does that say?
3      A.    This is my calculation that I computed
4  what my actual cost per ton is for the amount of
5  materials shipped with these seven containers, so I
6  arrived at this shipment cost me $87.01 per ton.
7      Q.    Is that your calculation taking the
8  numbers that Maersk has given you, the basic freight
9  rate and the other things, and you then convert that
10 to a per ton cost, or is that per ton cost your
11 estimate of what you should be paying?
12     A.    No.  This apparently seems to be a very
13 precisely calculated amount, there's one penny
14 showing, and I based it here on the actual -- I
15 mean, I could go through the exercise, but this was
16 kind of a control instrument for me.  When I
17 received the freight bill, I also checked it if the
18 data, the charges are correct, and what really
19 matters to me because in our business we buy dollars
20 per ton or cents per pound regardless if I ship
21 twenty tons or 20,000 tons, the nomenclature is
22 dollars per ton, and since the freight is such a
23 huge factor, it's important to know I buy $100, I
24 have $87, I sold for $200, so I have $13 profit.
25 That's the back of the envelope cross check,

Page 120

1  double-check, recheck, fore check for us to do
2  business.
3      Q.    I understand.  Now, we were talking
4  about handwritten changes, and then as you move up
5  the page, I see the word Shanghai for port of
6  discharge has been scratched out, and Chiwan has
7  been written in.  Is that your handwriting?
8      A.    That's correct, that's my handwriting.
9      Q.    Okay, who are you making these notes to?
10 Is that for yourself or to be sending to somebody
11 else?
12     A.    Well, I made that note apparently for
13 myself, but since that document also was faxed to
14 Jade that is evidenced by that note written at the
15 bottom of the page, then maybe I did this to show to
16 Jade, look, we initiated the change in destination
17 from Shanghai to Chiwan as you had requested.
18     Q.    Okay.  So your contractual partner, Jade
19 Alliance, originally told you to send this to
20 Shanghai, which is why Maersk has Shanghai in port
21 of discharge; is that right?
22     A.    That's a fair assumption, that's
23 correct.
24     Q.    In any case, you provided port of
25 discharge Shanghai to Maersk?

Page 121

1      A.    At original booking, that's correct.
2  Well, it's also possible, I can't rule it out, that
3  Maersk showed Shanghai as port of discharge whereas
4  we requested Chiwan.  This can happen, not often,
5  but it can happen that Maersk showed us a wrong port
6  of discharge, and we had to correct it.  As a matter
7  of fact, this did happy occasionally.  This was part
8  of the confusion that we had to talk to Maersk
9  Houston, Maersk Costa Rica.  That was a monster of a
10 mess.
11     Q.    In this case, though, for bill of lading
12 42109, Chiwan was actually a change of destination?
13     A.    Possible, but it's also possible that
14 Chiwan was -- was scheduled to be the original
15 destination, but Maersk gave us with Shanghai a
16 wrong port because previous statements may have gone
17 to Shanghai.  This did happen.
18     Q.    Now, the notify party in this case is
19 Minn Metals --
20     A.    Yes.
21     Q.    -- Steel Company in Beijing, China; is
22 that right?
23     A.    Apparently, that's on the copy of this
24 bill of lading.
25     Q.    Okay, and that's information that you

31 (Pages 118 to 121)

Page 122

1  provided to Maersk?
2      A.    Coming from my buyer in Hong Kong.
3      Q.    Okay, so Jade Alliance tells you tell
4  Maersk that Minn Metals is the notify party?
5      A.    That's correct.
6      Q.    Okay.  Now, your note to yourself
7  indicates that you faxed this on January 7th, 2004;
8  is that right?
9      A.    That is probably correct, yes.
10     Q.    To Jade Alliance?
11     A.    Yes.
12     Q.    I see a fax information line at the top
13 of the page that looks like January 7, '04, and then
14 there's a time.  What fax number is that indicating
15 that this was either sent to or received by?
16     A.    This is very possible you may find two
17 fax imprints on top of the page, so this is very
18 possible that this was first faxed to me from some
19 Maersk office, and then I forwarded from my fax --
20 see, my fax number is identified here two times,
21 (808) 394-2767, two times, and I think it is an
22 intelligent assumption here that it was first faxed
23 to me on 1-7-04 at 18:24 or 10:24 from MCS fax.  It
24 seems to be a Maersk fax to my fax number, and then
25 I used the same fax, made my handwritten notes, and

Page 123

1  faxed forwarded it to Hong Kong.
2      Q.    And why would you fax this document to
3  Jade Alliance in Hong Kong?
4      A.    As evidence that seven containers with
5  these container numbers with the rate have been put
6  on a voyage against the contract.
7      Q.    And this shows that the containers were
8  already halfway to China at this point, correct?
9      A.    Well, it is correct to assume that these
10 containers are on the water.  As a matter of fact,
11 yes, these containers are on the water, otherwise, I
12 would not have a bill of lading in my hand or a copy
13 of a bill of lading.
14     Q.    Now, you see in the middle of the page,
15 it's got the large print that says copy, do you see
16 that?
17     A.    Yes.
18     Q.    I'm looking one, two, three, four, five,
19 six, seven lines above that, in the middle of the
20 page there's an asterisk, and then it reads proof
21 copy, PLS advise release confirmation within 24
22 hours.  What does that mean?
23     A.    All right.  This could mean, and that
24 takes a little bit back what I just said a minute
25 ago, this could be the proof copy which I have

Page 124

1  received from some Maersk office somewhere in the
2  western hemisphere that they are about to execute
3  the original bill of lading, and we, Hartmann
4  Metals, please check the data if it is correct
5  because the bill of lading is a very vital
6  instrument, so it's very possible that I -- we
7  checked it, and we wrote it back to whoever in
8  Maersk it is and say, yes, it's correct or, no, we
9  need changes.
10            This could explain -- I mean, I am only
11 trying to come up with intelligent assumptions and
12 guesstimates here that we made that change to Chiwan
13 which would prove what I said earlier that Maersk
14 showed me Shanghai, and I said, no, and this is a
15 booking the destination has to be Chiwan, so in that
16 case, I would have gone back to Maersk and said,
17 guys, this is a mistake.  It happened before.
18     Q.    Okay.  So proof copy means to you in
19 this process that you have described at some point
20 they will fax to you a draft bill of lading --
21     A.    Yeah.
22     Q.    -- basically, and they say is the
23 information here correct?
24     A.    That is correct, yes.
25     Q.    And that's when you get the opportunity

Page 125

1  to say, no, there are changes or corrections or some
2  things wrong?
3      A.    That is correct.
4      Q.    Okay.
5      A.    Actually, this is confirmed by the fact
6  that you see under shipper where Hartmann Metals is
7  shown, above Hartmann Metals, please provide release
8  confirmation within 24 hours, so this confirms also
9  that Maersk Houston or Costa Rica probably sent this
10 to me.  Please verify it within 24 hours because now
11 time is of the essence, tell us is this correct or
12 not correct so that we can make the changes on the
13 real document because the shipment is about to take
14 place.
15     Q.    Okay, but this one I am looking down on,
16 it's at the bottom, it says lading on board in
17 Honolulu on December 30, 2003, so this one had
18 already been loaded, and it had set sail for Asia at
19 the time that you were faxing this to Jade Alliance,
20 correct?
21     A.    Apparently this is correct.  It shows
22 here bill of lading date of December 30th, so
23 consequently one would have to assume since this
24 correspondence took place here on January the 7th
25 that the containers were already on the water.

Page 126

1  Again, not unusual while the containers are now
2  sailing for three, four, or even seven days, the
3  final, correct, final version of the bill of lading
4  had to be executed, so time was really of essence
5  here.
6      Q.    Okay. Let's take a look at another bill
7  of lading.
8          MR. KUGLE: This one is Exhibit 7.
9          (Deposition Exhibit 7 was marked for
10         identification.)
11     Q.    (By Mr. Kugle) Mr. Hartmann, this bill
12 of lading pertains to thirteen containers of steel
13 strapped bundles shipped from Hilo ultimately to
14 Hong Kong; is that right?
15     A.    Apparently this is correct, yes.
16     Q.    And again, the shipper is your company,
17 Hartmann Metals?
18     A.    Yes.
19     Q.    So you initiated this transportation?
20     A.    Correct.
21     Q.    And you provided this information to
22 Maersk that appears in the top box as shipper,
23 consignee, and notify party?
24     A.    That's correct.
25     Q.    Now, I will have you look down again at

Page 127

1  the freight and charges section, a number of charges
2  appearing in the prepaid column with an ultimate
3  total of $40,807.32, United States dollars, do you
4  see that?
5      A.    Yes, I see that.
6      Q.    Are you going to tell me that this one
7  also is incorrect in some respect?
8      A.    It is incorrect in a big respect because
9  the original bill of lading or the first bill of
10 lading which we have received covers an amount of a
11 little over $27,000. This one shows $40,000, so we
12 have a difference here of roughly $14,000 because
13 this document here was changed, amended, after the
14 fact, after the sailing, and the amount of $14,000
15 in the form of administrative fees and mostly
16 demurrage was added at a later time. So Maersk took
17 the very convenient road after we had executed the
18 contract, changed a very vital document, the bill of
19 lading, and increased the rate to a substantial
20 amount.
21     Q.    Mr. Hartmann, when you say that you had
22 already executed a contract, which contract is that
23 that you are referring to?
24     A.    The contract and the agreement which is
25 reflected in a booking which we made. The booking

Page 128

1  number shows on top of this document. The booking
2  number is 002021350, and that contract,
3  understanding, booking, reflects an agreement
4  between Hartmann and Maersk to agree on the basic
5  freight rate, inland hauling charges, wharfage
6  charges, bunker adjustment fees, a couple other
7  smaller costs, but certainly not including here an
8  administrative fee of $780 per container and the
9  demurrage of 10, $12,000 because nobody could know
10 what demurrage will happen, could happen, and how
11 much the cost of the demurrage was. So this is
12 clear evidence that these costs, after they
13 happened, after the cargo arrived in China, after
14 the cargo was unloaded, after the containers were
15 returned empty, then the final demurrage can be
16 computed.
17     Q.    Okay. Let me have you just look back at
18 Exhibit 5 also. At the very top, it has the same
19 booking number on that bill of lading, do you see
20 that, 002021350?
21     A.    That is correct.
22     Q.    Okay. So these both refer to the same
23 booking?
24     A.    That is correct.
25     Q.    Why don't you explain to me what a

Page 129

1  booking is and how you go about making it?
2      A.    I can make a booking for one or two or
3  twenty or fifty containers. It is very possible
4  since we have here two different bill of lading
5  numbers showing one booking number, that it is
6  possible that I made a booking here for twenty
7  containers, thirteen plus seven. That is a
8  realistic booking, which we probably did.
9      Q.    Okay, let me ask you this: We will go
10 through it in pieces so that I understand what you
11 are telling me. When you make a booking, that means
12 that you call up Maersk, and you say I have got
13 twenty containers I want to send from Hilo to Hong
14 Kong or Chiwan or Shanghai. Please reserve space on
15 a ship for me. Is that what a booking is?
16     A.    That's correct. I make a booking for,
17 let's say, twenty containers. That does not
18 necessarily mean that these twenty containers go on
19 one ship. Then I would have only one bill of
20 lading. If they go on two ships, then I have two.
21 It could be even three ships. It happened in the
22 past that I made a booking for twenty containers,
23 and only thirteen were able to be loaded on the
24 vessel. The vessel was full. Then the balance of
25 seven or whatever containers rolled over to the next

33 (Pages 126 to 129)

Page 130

1  available voyage.
2      Q.    Is it because there is not room on the
3  ship, or is it because you haven't gotten the cargo
4  from your customer and gotten it to the yard yet?
5  What's the reason why it might not all go at once?
6      A.    It could be multiple reasons. First of
7  all, it could start with my supplier that he did not
8  have enough scrap, which usually was not the case.
9  Secondly, that we did not get enough containers in
10 Hilo from Maersk.  Third factor is that Young
11 Brothers doing the interisland hauling from Hilo to
12 Honolulu had more pressing, more urgent hauls to do.
13 Next reason is that Maersk here in the harbor had a
14 full ship and had to decide which containers stay
15 back and which must go, so there's all kinds of
16 reasons why under one booking number ideally all
17 containers go in one shipment, but for the reasons I
18 mentioned and even more reasons, the shipment could
19 be broken up into different shipments, different
20 bill of ladings, but still under one booking.
21     Q.    Okay, but in this case, these two bills
22 of lading, Exhibits 5 and 7 or bill of lading
23 numbers, I'll go by the last four digits, 2109 and
24 1026, as you sit here today, you don't recall why
25 these were broken into two?

Page 131

1      A.    I don't recall that, no.
2      Q.    Now, you were telling me that your
3  agreement with Maersk was the booking that you made.
4  Explain that to me.
5      A.    I have negotiated with Maersk a freight
6  rate from Hilo to Shanghai or Hong Kong.  After I
7  was able to determine that I can work with this
8  freight rate, that I can buy the material, that I
9  can sell the material and can ship it and have a
10 little margin, then I execute a buying contract, I
11 execute a selling contract, and I execute a freight
12 contract in the form that I make a booking.  So
13 Maersk is supposed to be committed to the freight
14 rate which they had quoted to me which is the basis
15 for my overall calculation, and I am committed to
16 honor that freight rate and pay whatever Maersk
17 quoted me for shipment in a very specific time
18 frame, usually a matter of four to six to eight
19 weeks.
20     Q.    How far out would you or could you make
21 a booking?  In other words, you just said four or
22 six or eight weeks.  Six months?
23     A.    Hardly.  Usually our bookings cover a
24 period of a couple of months.
25     Q.    But you knew that the freight rate that

Page 132

1  you would be charged is not the one that was in
2  effect on the date that you made the booking,
3  necessarily, but rather the one that's in effect on
4  the date the cargo was loaded?
5      A.    Not correct.  When I make a booking,
6  this is always based on the freight rate which was
7  clearly discussed, negotiated, and agreed upon, and
8  even if a day later the freight rates for whatever
9  reason go up, the shipping lines are committed to
10 honor the rate which they agreed once we exercised a
11 booking because the booking means signing the
12 contract, locking up the deal.
13     Q.    So you have a --
14         Do you have a signed contract at the
15 time that you make the booking?
16     A.    I have explained to you earlier usually
17 with shipping companies all over the world, you
18 don't execute signed contracts unless -- I take that
19 back, unless Maersk deals with the Pentagon -- and
20 this is not a story, this is honestly the truth.
21 Unless Maersk ships for the United States Government
22 a tremendous amount of cargo to the Far East and --
23     Q.    Okay, I am going to interrupt you
24 because I don't care about that.
25     A.    In that case, contracts will be signed,

Page 133

1  but not in this normal shipping business worldwide.
2      Q.    Now, you had testified earlier and you
3  used the term I negotiate a freight rate, but you
4  also said Maersk doesn't negotiate, they will tell
5  you what it is, and it's take it or leave it; is
6  that correct?
7      A.    By and large, that's correct.  When I
8  negotiate a freight rate, I -- I am not sitting
9  across the table.  I mean, sometimes shipping lines
10 and even Maersk at times were willing to cooperate
11 and try to do what is possible to make it fit.
12     Q.    Now, Maersk's policy was that a quote is
13 simply the current tariff rates in effect at the
14 time that you call and ask about it, but they are
15 going to charge you the existing tariff rates at the
16 time that you bring your containers in, you knew
17 that, correct?
18     A.    That's not correct because when we
19 discussed or I received the freight rates, that was
20 -- I believe that was even given in writing to me.
21 I have to dig it up.  I have come to learn that I
22 have to save every piece of paper.  But unless
23 Maersk says the freight rate is subject to change
24 without notice, then I know they can change it at
25 any given time, but they didn't do that.  They

34 (Pages 130 to 133)

Page 134

1  usually give me this rate is good until the end of
2  this month or until the end of ta, ta, ta, ta.
3      Q.    Okay.  On these two bills that we are
4  looking at now, 2109 and 1026, the freight rate
5  itself didn't change in any event, correct?
6      A.    Apparently not.  Yes, it looks like it
7  did not change, I mean, the base rates and the
8  related expenses.
9      Q.    So when you made this booking, this was
10  all part of one larger shipment, and I think we are
11  going to see a series of documents where you and
12  Maersk and presumably your customer Jade Alliance
13  treated them all in conjunction, even though they
14  were sailing on two different vessels, do you recall
15  that?
16      A.    This is very possible that this was part
17  of one sales contract which I had broken down in two
18  or even more shipments.
19      Q.    Okay, we had talked earlier about
20  diversions, and we had questioned Hong Kong,
21  Shanghai, or Chiwan.  Let me show you now the next
22  exhibit which might refresh your recollection a
23  little bit about these particular two shipments.
24          MR. KUGLE:  We will have this one marked
25  as Exhibit 8.

Page 135

1          (Deposition Exhibit 8 was marked for
2  identification.)
3          MR. KUGLE:  Why don't we go off the
4  record and take a five-minute break because we have
5  been going for a hour?
6          (Discussion off the record.)
7          MS. FARIAS:  I have just indicated that
8  I have to leave the deposition for about
9  half-an-hour and that I do not object to
10  Mr. Kugle continuing to ask Mr. Hartmann questions,
11  however, if there is a question that Mr. Hartmann is
12  uncomfortable about answering, if Mr. Kugle will
13  kindly defer that question until after I return, and
14  then if he can ask the question at that time, and if
15  I need to object, I can object.  Is that okay?
16          MR. KUGLE:  I have agreed to do that.
17          MS. FARIAS:  Okay.
18          MR. KUGLE:  Yes.
19          MS. FARIAS:  Off the record.
20          (Recess was taken.)
21          MR. KUGLE:  All right, let's go back on
22  to the record.  We are back on the record, and just
23  as she indicated just before the break, Ms. Farias
24  has run an errand, and I understand she will be back
25  soon, and as she authorized, we are to proceed with

Page 136

1  the deposition.
2      Q.    (By Mr. Kugle)  Mr. Hartmann, we were
3  looking at Exhibit 8, and I am going to ask you
4  whether this refreshes your recollection about
5  whether these shipments that were being made right
6  around late December, early January from Hilo to
7  Asia under that booking 2021350 were in fact
8  diverted from the original destination to Chiwan,
9  and does Exhibit 8 refresh your recollection about
10  that?
11      A.    I don't recall that this refers to a
12  rerouting.  I don't deny it.  It's possible, but
13  this copy of this e-mail does not -- wait a minute.
14      Q.    Actually, let me not jump ahead which is
15  what I did.  First off, is this an e-mail that you
16  sent to Maersk?
17      A.    I replied to an e-mail which was sent to
18  me, and I answered.
19      Q.    Okay, and I have seen this before, and
20  maybe you can describe it to me.  Is it your normal
21  practice in sending and receiving and responding to
22  e-mail that you will type your comments in the
23  e-mail message from the sending party?
24      A.    It happens very often, yes.
25      Q.    Okay.  So as we are looking at Exhibit

Page 137

1  8, there is a large section of text with a line down
2  the left side and a paragraph that starts off with
3  Hanni and ends with the letters B R G D S.  That was
4  the original message; is that correct?
5      A.    Probably, yes.
6      Q.    And then your response to that is typed
7  in bold below it, and it says, quote, this is to
8  confirm that we agree to absorb this conversion fee
9  of $200 per this B, slash, L, unquote; is that
10  right?
11      A.    That's correct.
12      Q.    So what was being asked of you, and what
13  are you saying to Maersk in this e-mail?
14      A.    Maersk is asking me to -- let me just
15  read it.  Yeah, okay.  This is what took place right
16  now after we received a request to change from Hong
17  Kong or whatever to now Chiwan, and this mail from
18  Maersk, I assume it came from Pam Lake, but since
19  Maersk unfortunately did not put their names down,
20  we don't know it for sure.  They needed my, our
21  authorization as shipper on record to divert these
22  containers, and this involved a $200 fee, and I
23  agreed to that, however, here is a mistake which I
24  made or an incompletion instead, to agreeing that we
25  are responsible for this fee as shipper on record

35 (Pages 134 to 137)

Page 142

1  consignee, and then she came back and gave us
2  tentatively.  This seems to be correct, yes.
3      Q.    And now let me just ask you to take a
4  look back at Exhibit 6 in the stack.
5      A.    Oh, yes.
6      Q.    Okay, and then as you look at Exhibit 6,
7  that's got the same information.  The consignee is
8  to order, and the notify party is Minn Metals.  In
9  other words, we are talking about the same shipment,
10 correct?
11     A.    Not necessarily because here on this
12 Exhibit 9, the correspondence refers to six
13 containers.  Exhibit 6 refers to seven containers,
14 very possible same contract but a different
15 shipment, but the same intent.
16     Q.    Okay.  So in other words, this e-mail
17 has nothing to do with bill of lading 2109?
18     A.    Not necessarily.  It could be very well
19 the same contract but different shipment because
20 here we have only six containers with 152 tons, and
21 here we have seven containers with 177 tons, so this
22 is two different shipments but very possibly under
23 the same contract, but I don't know if -- if -- if
24 that is also of significance.
25     Q.    Okay, and thank you.  When you say

Page 143

1  contract, your e-mail refers to contract
2  102803-S-365?
3      A.    Correct.
4      Q.    And that would be the contract between
5  you and Jade Alliance?
6      A.    Correct.
7      Q.    That controls or deals with all these
8  bookings and shipments that we are looking at?
9      A.    Right.  However, the contract number
10 does not appear on bill of ladings.  In that case,
11 we would have a reference, a cross reference.
12     Q.    Well, the contract was never provided to
13 Maersk, correct?
14     A.    That is correct.  As I said earlier, my
15 purchase contracts from Big Island Scrap Metal and
16 my sales contract to Lee Cheung are of no
17 significance to Maersk.
18     Q.    Correct, and neither those contracts nor
19 those contract numbers were ever provided to Maersk?
20     A.    That's correct, because they don't need
21 them.
22          MR. KUGLE:  All right.  Let's mark this
23 our next Exhibit Number 10.
24          (Deposition Exhibit 10 was marked for
25          identification.)

Page 144

1      A.    See, may I make a remark back on to 9?
2  At the bottom in my mail to Hong Kong, I say at this
3  time we are still waiting to receive from Maersk the
4  amended freight cost, if any, so this is to be also
5  understood as, look, if there is a freight
6  difference because you wanted to go now from Hong
7  Kong to Chennai, this is your responsibility.  I
8  mean, I agree, I could have spelled it out more
9  precisely.
10     Q.    Okay, wait.  Let me ask you two
11 questions.  First you say -- I don't know my
12 geography quite as well as you.  Chennai, is that
13 the same thing as Chiwan?
14     A.    Could be, I don't know.  There are so
15 many ports now.
16     Q.    Okay, because this e-mail is actually
17 referring to Chiwan.
18     A.    Okay.
19     Q.    We are looking at Exhibit 9 --
20     A.    Yes.
21     Q.    -- and you say to the ladies at Jade
22 Alliance, quote, since you refer to ship to Chiwan,
23 please advise if the notify party consignee will
24 change.
25     A.    Actually, I don't know.  I believe

Page 145

1  Chiwan and Chennai -- no, it's both Chiwan, in both
2  cases Chiwan, Chiwan.
3      Q.    That's why you are now looking at
4  Exhibit 6 --
5      A.    6.
6      Q.    -- which says Chiwan --
7      A.    Right.
8      Q.    -- and Exhibit 9 which says Chiwan --
9      A.    Right.
10     Q.    -- and that's why I asked you if those
11 were actually both --
12     A.    Yes, sir.
13     Q.    -- relating to the same shipment?
14     A.    Yes, sir.
15     Q.    Yes, they are?
16     A.    Yes, they are.
17     Q.    Even though one talks about six
18 containers and the other talks about seven, probably
19 another container got added on in there; is that
20 right?
21     A.    I doubt it.  This is probably two
22 different shipments, one consisting of seven and one
23 consisting of six.  Well, I don't know.  I don't
24 know.  I don't want to guess something wrong.  It
25 could be two different shipments, one of six, one of

Page 146

1  seven. It could be that originally we were advised
2  that six containers are going, and then they wound
3  up being seven.
4      Q.    Okay. Now, on Exhibit 9, you had begun
5  to explain to me, I think, that in your e-mail, and
6  this is an e-mail back and forth between you and
7  your Asia customer and not Maersk --
8      A.    Right.
9      Q.    -- but you are recognizing that because
10  somebody is choosing to change the destination
11  ports, there is going to be additional freight costs
12  incurred by Maersk and, therefore, to be paid by
13  somebody; is that right?
14      A.    That is correct, and that's why this
15  line here at the bottom serves only the purpose to
16  show as evidence that with all these changes
17  changing to Chiwan, there could be additional costs.
18  That's why I said any amended freight cost, if any.
19  We talked on the subject, okay, if you like to go to
20  Chiwan instead of Shanghai, you have to pay that
21  difference. My responsibility was to deliver to
22  Shanghai, which we did.
23      Q.    Okay, I understand that. I want to set
24  this in context. Between you and your customer,
25  your customer is saying let's move this stuff all

Page 147

1  around Asia, send it here, send it there, and you
2  are telling them, hey, that's going to cost Maersk
3  money, somebody is going to have to pay for that,
4  and you are saying that this e-mail from you is
5  putting them on notice that between you and them,
6  you viewed them as being responsible for the
7  additional costs?
8      A.    There could be additional costs, if any,
9  because sometimes, and please understand this is
10  part of the freight business, let's say I make a
11  shipment from Hilo, Honolulu, to Shanghai, and then
12  I make a shipment from Hilo to Honolulu to Shanghai
13  to Chennai, so there is another leg. That does not
14  necessarily mean that the freight will be now
15  higher. This is crazy, but in the freight business,
16  sometimes a longer haul costs less or even the same
17  or even less. Doesn't make sense from a logical
18  point of view, but this is how it works.
19      Q.    Let me ask you this, though. When you
20  begin --
21          You don't divert an entire container
22  ship from one port to the next because somebody
23  decides that six containers should be in Chiwan
24  rather than Shanghai. I mean, the ship is going to
25  go where it goes, and then they either have to be

Page 148

1  off loaded and put on another ship and moved to the
2  new port, or if that ship continues on to the next
3  port, they may have to be repositioned on the ship,
4  but they still move; is that correct?
5      A.    That is correct. Maersk ships usually
6  go from Honolulu or from the West Coast to major
7  hubs like Hong Kong and Shanghai, and then
8  containers will be unloaded and will be distributed
9  by satellite vessels, much smaller, into five, six,
10  seven, eight, ten smaller ports.
11      Q.    Okay. Now, let's move to Exhibit 10
12  because, again, I am trying to understand how this
13  number of containers that were apparently on the
14  ocean are being diverted all around Asia, and I
15  think that Exhibit 10 might explain that, but take a
16  look at that, and you tell me what Exhibit 10 is.
17      A.    I am glad I see this exhibit. Okay, I
18  have read it. What's your question?
19      Q.    All right. My question again is this
20  e-mail is your recognition that your customer in
21  China has shifted the original port from Shanghai to
22  Chiwan; is that right?
23      A.    That's correct. Apparently, my customer
24  diverted from Shanghai to Chiwan. This can be read
25  or understood from reading this mail.

Page 149

1      Q.    And we know it's the same customer
2  because Florence at Sinogrand is copied on this
3  e-mail, Florence being the person in Lee Cheung's
4  office; is that right?
5      A.    That is correct.
6      Q.    Which shipment are we talking about,
7  which shipment are you talking about here in this
8  e-mail? We have seen bills of lading involving
9  seven containers and thirteen containers, both of
10  which were going to Jade Alliance and both of which
11  were shifted, I believe, from Shanghai to Chiwan, or
12  is this talking about all of them?
13      A.    That's not clear if it talks about one
14  or two or all or how many shipments, however, it
15  must revert or point out to a fact, and I totally
16  forgot about that, that we had agreed on a $200 per
17  bill of lading cost which we discussed just a few
18  minutes ago with my expression that I was not
19  precise enough to make sure well, da, da, da, it
20  should be paid from China.
21      Q.    Okay.
22      A.    And now --
23      Q.    Let me ask you a question. You are
24  referring to -- let me count the lines of text, one,
25  two, three, four, five -- the sixth line down in

38 (Pages 146 to 149)

Page 162

1 referenced in its text, is also referring to the
2 same bill of lading?
3     A.    That is reasonable to assume that
4 Exhibit 10 -- can I make a note on this document
5 here to write the bill of lading number on this, is
6 that acceptable?  Because --
7     Q.    You can --
8     A.    -- then we have a reference.
9     Q.    You can go ahead and mark up that
10 exhibit now if it's going to help you.  We will know
11 that you put that on now rather than back then.
12     A.    Is this my documents or --
13     Q.    No.  That will be attached to the
14 deposition transcript.
15     A.    Okay.
16         MS. FARIAS:  Can we go off -- oh, go
17 ahead.
18     A.    Because this Exhibit 10 now does
19 apparently refer to this bill of lading number which
20 I would like to just write down here so that it's an
21 easier reference.
22     Q.    (By Mr. Kugle)  Well, don't bother.  You
23 don't have to do that because we have just agreed
24 that Exhibit 10 is referencing bill of lading number
25 1029.

Page 163

1     A.    Right.
2     Q.    We don't have to mark it.  Your attorney
3 just walked in.
4         MR. KUGLE:  Did you want to go off the
5 record, Cynthia?
6         MS. FARIAS:  Yes, just for a minute.
7         (Discussion off the record.)
8         MR. KUGLE:  Let's go back on the record.
9         We did have one issue or question that
10 came up that Hanni said that you knew something
11 about or that he was going to defer to you.  I don't
12 know what that was.  The issue was Hanni said that
13 he understood that Jade Alliance had offered to make
14 a full payment of all amounts owed to Maersk -- I'm
15 sorry, go ahead.
16         THE WITNESS:  A light correction.  That
17 I know that Jade Alliance or Hong Kong made an
18 effort, an attempt to pay some money.  I do not know
19 if it was the full amount, paid some -- tried to pay
20 some money in China, I believe it was either Hong
21 Kong or Shanghai, and that payment was not accepted
22 by Maersk, and I thought you know a little bit more
23 about that.  Do you recall that?
24         MS. FARIAS:  Was that in response to a
25 question of yours or --

Page 164

1         MR. KUGLE:  Yes, it was in response to a
2 question about what evidence there was that Jade
3 Alliance -- the questioning had went along the lines
4 of Hanni was explaining his agreement with Jade
5 Alliance that between the two of them, who was to be
6 paying what fees to Maersk --
7         MS. FARIAS:  Okay.
8         MR. KUGLE:  -- and I asked him whether
9 he or Jade Alliance had ever communicated that to
10 Maersk, how Maersk knew about it because he has
11 already said that the agreements between Jade
12 Alliance and Maersk -- I'm sorry.  The agreements
13 between Jade Alliance and Hartmann Metals are none
14 of Maersk's business, and Maersk didn't have them,
15 didn't see them, didn't know about them.  And so we
16 were going into, well, what evidence is there that
17 Maersk knew that it was supposed to be paid by Jade
18 Alliance and that Jade Alliance had actually tried
19 to make the payment?  But I think what Hanni is
20 saying now is he thinks that Jade Alliance, and
21 correct me if I am wrong, Jade Alliance tried to
22 make a payment, a partial payment on some demurrage
23 somewhere in Asia to Maersk.
24         THE WITNESS:  Basically, correct, to my
25 knowledge Jade Alliance or Lee Cheung attempted to

Page 165

1 make a payment.  I do not know if it was demurrage
2 or if it was detention, but it was for fees
3 originating in China because of all of these
4 containers shifting around, and that payment was not
5 accepted by Maersk.
6         MS. FARIAS:  Okay.
7     Q.    (By Mr. Kugle)  All right.  Let's go
8 back to Exhibit 12.
9         MS. FARIAS:  Is this 12, Exhibit 12?
10         THE WITNESS:  Yes, Exhibit 12, we were
11 discussing this.
12     Q.    (By Mr. Kugle)  Which part of Exhibit
13 12, if you can read to me, are your words?
14     A.    That small line, we are in agreement to
15 pay the $900 for this diversion.
16     Q.    Okay, and also if you go back up to the
17 top just under the subject line, you write dear
18 writer of this message, is that also your language?
19     A.    That is correct.
20     Q.    So here again, you are telling Maersk we
21 agree to pay $900 for diversion, is that what you
22 are saying in this e-mail?
23     A.    Yeah, and this statement was made with
24 my back against the wall because I had no other
25 choice after consulting with Carlos Sullivan, after

42 (Pages 162 to 165)

Page 166

```
 1   venting my frustration, after, please, somebody with
 2   a live body talk to me.
 3      Q.   Thank you.  Let's take a look at the
 4   next exhibit which is 13.
 5           (Deposition Exhibit 13 was marked for
 6           identification.)
 7      Q.   (By Mr. Kugle)  Do you recognize that
 8   document, Mr. Hartmann?
 9      A.   First of all, yes.  Let me just read it
10   for a second.  It is correspondence which I
11   recognize.
12      Q.   This is an e-mail from you to somebody,
13   correct?
14      A.   Yeah.  Apparently, I received here an
15   e-mail from Pam Lake to me on the bottom section.
16      Q.   So everything with the line down its
17   side on the left-hand side, that is Pam Lake's
18   e-mail to you?
19      A.   That's correct.
20      Q.   Okay, and then your e-mail is located
21   above that?
22      A.   Yeah, forwarding it to Hong Kong to
23   these two ladies who used to work in that office.
24      Q.   Okay, and that is Jade Alliance?
25      A.   Yeah.
```

Page 167

```
 1      Q.   Or Lee Cheung?
 2      A.   One or the other, yeah.
 3      Q.   Same thing?
 4      A.   Yes and no.  See, I understand these are
 5   two companies.  At one time I worked with Jade, at
 6   another time with Lee Cheung.  I had a contract with
 7   Lee Cheung, and then the people from Jade replied,
 8   but I didn't untangle that.
 9      Q.   So sometimes you don't even know who you
10   are dealing with in Asia?
11      A.   Well, the principal party was Justin Chu
12   like I said earlier, and these ladies were
13   administrators handling the paperwork.
14      Q.   Okay.  Now, if you read your subject
15   line at the top of the e-mail, now we are clearly
16   talking about both of these bills of lading,
17   correct, the twenty containers of cargo that had
18   been diverted around Asia, is that what we are
19   talking about?
20      A.   If these two bill of lading numbers
21   shown here refer to the thirteen and seven, then I
22   don't deny that these are apparently the twenty
23   containers.
24      Q.   Well, let's just refer back to Exhibit 5
25   which is bill of lading number 2109, that relates to
```

Page 168

```
 1   the seven containers that had sailed on December
 2   30th --
 3      A.   Correct.
 4      Q.   -- right?
 5      A.   Yes, correct.
 6      Q.   Okay, and then the second bill of lading
 7   number referred to in the heading of your e-mail is
 8   1026, which is the thirteen containers that sailed
 9   from Hilo on January 13th?
10      A.   Yeah, that is correct.
11      Q.   And both of them relate to that same
12   booking number that you described earlier that you
13   had made possibly for all twenty containers --
14      A.   Yeah.
15      Q.   -- which was booking number 2021350,
16   and, again, that's in the subject line of your
17   e-mail, correct?
18      A.   Where is the booking number?
19      Q.   At the very -- the top line of the
20   e-mail, the subject line.
21      A.   Okay, found it, yes, yeah, correct.
22      Q.   You had both bill of lading numbers and
23   the booking number?
24      A.   Correct, yes, correct.
25      Q.   Now, you got a -- what was Pam Lake
```

Page 169

```
 1   asking you?  I mean, I can read her e-mail, but
 2   paraphrase what you understood she was telling you.
 3      A.   She basically is asking here since --
 4   per Hong Kong through Hartmann's request that this
 5   -- the cargo was diverted, and Pam is asking does
 6   that mean new data for consignee?  It could be the
 7   same consignee.  It could be somebody else.  She
 8   just wanted to make sure does it stay, or does it
 9   change?  Since I can not answer that question, I
10   forwarded Pam Lake's message as is with my e-mail
11   question to these ladies in Hong Kong, here with Pam
12   Lake's message, please reply.
13      Q.   Well, let me ask you is, the reason that
14   Pam Lake is asking you this question is because
15   originally the information that Jade Alliance
16   provided to you and the information that you
17   provided to Maersk was that these containers were
18   going to Minn Metals Steel Company in Beijing,
19   China; is that right?
20      A.   That's correct, I recall that Minn
21   Metals appears on the previous --
22      Q.   That would, for instance, be on Exhibit
23   6?
24      A.   Yes.
25      Q.   And that would also be found on Exhibit
```

43 (Pages 166 to 169)

Page 170

```
 1   9, Florence's e-mail to you saying Minn Metals in
 2   Beijing?
 3        A.    Here it is. Yeah, Florence indicated to
 4   us tentative Minn Metals in Beijing.
 5        Q.    And the reason why that was creating a
 6   problem, a question from Pam Lake and a problem for
 7   Maersk is because although the cargo had been
 8   diverted and was now sitting in Hong Kong, it shows
 9   the notify party as being in Beijing, China, right,
10   and so they were asking you is this still correct?
11        A.    That is a reasonable assumption,
12   correct.
13        Q.    Well, now, I don't want to assume
14   because, I mean, this is the information that you
15   and your customer provide to Maersk, and so we need
16   -- I am trying to get at what point in time Maersk
17   had accurate information about who this cargo was to
18   be released to?
19        A.    Hartmann Metals acted only as a conduit
20   in between because we can supply Maersk only the
21   information which we receive from our supplier, so I
22   can assure that whatever information we had we
23   forwarded to Maersk, and whenever Maersk had a
24   request like this shown here on this e-mail from Pam
25   Lake, we immediately forwarded it for fast as
```

Page 171

```
 1   possible action to avoid delays.
 2        Q.    All right.  So at this time that this
 3   e-mail was sent which was January 28th, 2004, you
 4   e-mailed to Jade Alliance, these two bills of lading
 5   still showed the notify party or consignee as being
 6   in Beijing, China, and not in Hong Kong; is that
 7   correct?
 8        A.    I basically said here to these two
 9   ladies, look, I forwarded to Maersk the information
10   which I have received from you which apparently was
11   Minn Metals, and since they are able to read here
12   the attached or the previous mail from Pam Lake to
13   me, is that still the same?  Please confirm.  Okay,
14   ladies, is this still the same or not?  Come back --
15   and I say please reply to all parties, not only to
16   me, but to make matters faster, to all the people
17   who are on this list of recipients.
18        Q.    And was that information that was
19   originally supplied from you to Maersk, was that
20   correct or not?
21        A.    I do not know that at this time.
22        Q.    In looking at those two final bills of
23   lading that we looked at earlier, 2109 and 1026,
24   that doesn't tell you whether the information that
25   you had provided originally had changed?
```

Page 172

```
 1        A.    From my knowledge as of today, I don't
 2   think so.
 3        Q.    You don't think it had changed --
 4        A.    No.
 5        Q.    -- even though the bill of lading
 6   numbers that we are now -- the final bills of lading
 7   which are Exhibit 7 and Exhibit 5 show that they are
 8   to be notified and that they were delivered to Hong
 9   Kong with the notify party in Hong Kong rather than
10   in Beijing?
11        A.    I pretty much recall that the consignee
12   and notifying party were not changed.  The
13   destination port was changed, and that is not
14   necessarily a discrepancy or a conflict.
15        Q.    Okay, but if we look back on your
16   original proof copy of bill of lading number 2109
17   which is Exhibit 6, there the notify party was Minn
18   Metals in Beijing, and by the end of the day, if you
19   look at the final bill of lading 2109, which is
20   Exhibit 5, it has now changed from Minn Metals in
21   Beijing to Sing Fung Trading in Hong Kong.
22        A.    All right, I don't deny that it could
23   have changed.  I recall usually the destination
24   change, but if this is the case that it changed from
25   Minn Metals to Sing Fung, then this happened.
```

Page 173

```
 1            MR. KUGLE:  Okay, let's move on to
 2   Exhibit 14.
 3            (Deposition Exhibit 14 was marked for
 4   identification.)
 5        Q.    (By Mr. Kugle)  Exhibit 14 is your
 6   e-mail from the following day, is that right, in
 7   other words, the day after January 28th, Exhibit 13?
 8        A.    Looks like it, yes.
 9        Q.    And you recognize that as your e-mail?
10        A.    Part of it is e-mail which I have
11   contributed to.
12        Q.    Okay.  Let's start first with the
13   subject line.  Again, we are still talking about
14   these same two bills of lading, correct?
15        A.    Okay.  Can you repeat that question,
16   please?
17            MR. KUGLE:  Can you read that question
18   back?
19            (The question was read back by the court
20   reporter.)
21        A.    Apparently, yes.
22        Q.    (By Mr. Kugle)  So in other words, this
23   e-mail, Exhibit 14, is concerning Exhibits 7 and 5
24   that we have been looking at, correct, bills of
25   lading 1026 and 2109; is that right?
```

Page 178

1    Q.    Okay.  Now, you testified earlier that
2  you have to get original bills of lading because you
3  have to get it to your customers because that's how
4  you get paid, but here we have got twenty containers
5  that are sitting in Asia somewhere, and your
6  customer hasn't been supplied original bills of
7  lading from you, and so now you are complaining what
8  might have happened.  Is that what you are doing in
9  this document?
10    A.    Looks like it.  I am saying here in the
11  paragraph above, we have not received the OBLs for
12  these two shipments either.  So apparently Maersk
13  has not received data which was necessary for Maersk
14  to issue the OBLs, that's what I am saying here, so
15  that they can release them to us.
16    Q.    So what you are saying is that the
17  information -- that Maersk was trying to contact the
18  notify party in Beijing, and you are saying that the
19  numbers that Jade Alliance had supplied didn't work,
20  and that needs to get straightened out before
21  original bills of lading can be issued, correct?
22    A.    That's what I am saying here.
23    Q.    Well, I just want to be clear.  So for
24  these twenty containers, this is January 29th, 2004,
25  they are already sitting in the port in Maersk's

Page 179

1  yard at that time; is that right?
2    A.    We don't know that, but we can find out
3  when these containers arrived in China.
4    Q.    Okay, but in all likelihood, because
5  they had left Honolulu on December 30th and January
6  13th, if you recall from the original bills of
7  lading that we had looked at?
8    A.    That's a fair assumption.
9    Q.    So Maersk is sitting there with bad
10  information and doesn't know what to do or can't
11  issue bills of lading because somebody didn't give
12  it the proper information, is that what you are
13  saying?
14    A.    Yeah, what surprised me here is why did
15  Maersk try to contact the notifying party, well, to
16  notify them apparently in Beijing, so obviously
17  there was some breakdown in the communication which
18  we as Hartmann Metals can only convey between the
19  parties.  If Maersk needs the information, we have
20  to supply it coming from Hong Kong.  Maersk tries to
21  contact the notifying party in Beijing based on the
22  data which we supplied and based on the data which
23  we received from Hong Kong, so we are trying to help
24  straighten out here that everything goes smooth.
25  Apparently, a couple of things were not as smooth as

Page 180

1  they were supposed to be.
2    Q.    Right.  You are telling your customer in
3  Hong Kong get us the correct information so we can
4  get these bills of lading, that's what you are
5  saying --
6    A.    Yeah.
7    Q.    -- is that right?
8    A.    Yeah, and I even indicated, so please
9  work directly with Maersk in Hong Kong and/or
10  Shanghai to get this matter straightened out, to
11  just get it straightened out.
12    Q.    And then also Florence tells you, we had
13  just wondered whether these containers were actually
14  sitting in the port somewhere.  Florence's e-mail to
15  you says, she concludes by basically saying, quote,
16  if you have not yet sent it out, please send it to
17  us without delay as the captioned shipment has been
18  arrived Chiwan, China.
19    A.    Right.
20    Q.    So at that point, you and either Jade
21  Alliance or Lee Cheung, whoever you are dealing
22  with, all know that these containers are sitting
23  somewhere in China and Maersk doesn't have the
24  proper information to get the documentation out?
25    A.    That's a fair assumption.

Page 181

1         MR. KUGLE:  Okay, let's mark the next
2  exhibit.
3         (Deposition Exhibit 15 was marked for
4         identification.)
5    Q.    (By Mr. Kugle)  I give you this one
6  next, Mr. Hartmann, because it is dated at least by
7  that fax transmission date up at the top January 30,
8  2004.  Have you seen this document before?
9    A.    Probably.
10    Q.    This is from Hartmann Metals' files?
11    A.    That's probably the case.
12    Q.    Well, the H 30 at the bottom right-hand
13  corner I think was added by your attorney and not by
14  us.  You don't recognize that, but do you recognize
15  the other handwriting on the document?
16    A.    No, I don't.  It is possible, however,
17  that this is a document which was now exchanged
18  between Dora and this lady in Carolina, however, it
19  is related to, apparently, shipments which I may
20  have seen in another form because this is not
21  necessarily a copy of a bill of lading.
22    Q.    Right, this is simply a freight invoice.
23    A.    Yes.
24    Q.    And if you were to compare this one up
25  here at the top, it says bill of lading number 2109,

46 (Pages 178 to 181)

Page 182

1   do you see that?
2       A.    Yes.
3       Q.    So again, we know that this is a freight
4   invoice related to that bill of lading number.
5   Well, have you ever seen these handwritten numbers
6   before?
7       A.    No.
8       Q.    Those are basically --
9             Would you agree that those are the
10  numbers that are reflected on the final bill of
11  lading which was Exhibit 5 that we had looked at?
12      A.    Well, there's already one difference.
13  It refers to the seven containers.  It refers to the
14  same bill of lading number, but there's already one
15  discrepancy.  The basic freight rate now shows $100
16  per container difference.
17      Q.    $100 per container cheaper?
18      A.    More expensive.  It used to be $1,200,
19  and now on this Exhibit 15 it shows $1,300.
20      Q.    Well, let me ask you.  Let's take a look
21  at the one we know you had in your hand back at the
22  beginning of January which was Exhibit 6.  Again,
23  it's the same bill of lading number, 2109, correct?
24      A.    Yes.
25      Q.    That has a base freight rate of $1,300

Page 183

1   per container?
2       A.    Yes.
3       Q.    Okay, and then the one we just looked
4   at, Exhibit 15, also has $1,300 per container as the
5   basic freight rate?
6       A.    Correct.
7       Q.    But the final bill of lading which we
8   were looking at, Exhibit 5, again, 2109, actually
9   has a lower basic freight rate, $1,200 --
10      A.    Correct.
11      Q.    -- right?
12      A.    Yeah.
13      Q.    So it was actually decreased.
14      A.    Well, you say Exhibit 5 is the final,
15  which I vehemently oppose because Exhibit 5 includes
16  here this roughly twenty nine thousand dollars in
17  costs which originated in Hong Kong which I have --
18  which I flat refuse.  I mean, the difference here of
19  $100 per container is $700 total, so that's
20  significant, but that's not so significant like
21  $22,000.
22      Q.    Okay.  All right, let's take a look at
23  another exhibit.
24            MR. KUGLE:  Let's have this one marked
25  as 16.

Page 184

1             (Deposition Exhibit 16 was marked for
2   identification.)
3       Q.    (By Mr. Kugle)  Do you recognize Exhibit
4   16?
5       A.    Yes.
6       Q.    And this is an e-mail from you to Pam
7   Lake?
8       A.    Yes.
9       Q.    And you are responding to an e-mail that
10  you must have received from Pam?
11      A.    Apparently, yes.
12      Q.    Your portions of the e-mail appear in
13  bold, and Pam's are not in bold; is that right?
14      A.    My reply is in bold, yes.
15      Q.    Okay.  So Pam was e-mailing to you
16  talking about processing final documentation and
17  mentions that they are incurring storage charges and
18  asking you how you want to proceed?  Is that what
19  Pam is asking you?
20      A.    Yes.  See, Pam -- at least note that
21  this mail also went in copies to Hong Kong, to my
22  client in Hong Kong.  Denise is shown and Florence
23  is shown here as a recipient, and Pam Lake is asking
24  here, Hong Kong advises of storage charges which
25  continue to accrue, have asked them to advise

Page 185

1   amount, and we will advise.  We shall also -- and we
2   shall also advise if there is additional COD
3   charges, and that means cash on delivery over there.
4   This also is an indicator charges which have to be
5   borne and paid in Hong Kong for another change of
6   destination.  This is a signal, I wish it was
7   stronger, and I would have replied stronger to point
8   out, yeah, okay, whatever charges occur, this the
9   responsibility of these turkeys in Hong Kong.
10      Q.    Okay, and so we don't know when her
11  e-mail to you was, but your response date is
12  February 3rd, 2004, right?
13      A.    Right.
14      Q.    And so Pam is telling you we have got
15  some charges continuing to accrue over here.  We
16  have got some problems, and we are going to advise
17  you what that is and whether there is going to be
18  another change of destination.  Because now we are
19  actually talking about cargo in Hong Kong rather
20  than Chiwan; is that right?
21      A.    That's probably a fair assumption.  See,
22  I replied partially to her message, quote, Hartmann
23  now, we are in agreement that Maersk can proceed to
24  make the changes as per the request of my client Lee
25  Cheung, slash, Jade Alliance in Hong Kong.  So I

47 (Pages 182 to 185)

Page 186

1  point out these changes all originate from over
2  there. Again, I missed to make it very clear, and
3  all of these changes will be paid and borne in Hong
4  Kong. And then later I replied to Pam, always with
5  copy to Hong Kong, please let us know as soon as
6  possible what the charges might be, which are to be
7  borne by Hong Kong. I'm not precise and clear about
8  that.
9      Q.    Okay, yes, I don't see that.
10          Okay, this is a good point to take a
11  break because we have been going for over an hour.
12     A.    Can I request that we proceed? I mean,
13  I'm okay. That --
14     Q.    Well, we will give the court reporter a
15  couple of minutes.
16          MR. KUGLE: Let's go off the record.
17          (Discussion off the record.)
18     Q.    (By Mr. Kugle) Okay, let me show you
19  now Exhibit 17.
20          (Deposition Exhibit 17 was marked for
21          identification.)
22     Q.    (By Mr. Kugle) You are reviewing
23  Exhibit 17, and I am just going to remind you or
24  refer you back to Exhibit 16 in which you told Pam
25  Lake on February 3rd, let us know ASAP what the

Page 187

1  charges might be. Do you remember that from your
2  prior e-mail, Exhibit 16?
3      A.    Yeah.
4      Q.    Okay, now, take a look at Exhibit 17,
5  have you seen that before?
6      A.    I don't know. I don't recall, but
7  apparently it was addressed to me, so it is --
8      Q.    Okay.
9      A.    -- not unreasonable to assume that I
10  have received it.
11     Q.    And I know you said you weren't sure
12  about things, but the from in the original message
13  line up at the top says HNLMNG, slash, PEL. Who is
14  PEL?
15     A.    I have no idea.
16     Q.    Pam Lake?
17     A.    I don't know.
18     Q.    Okay, let me just have you look back
19  real quick at Exhibit 16 which was your e-mail --
20     A.    Yes.
21     Q.    -- and you were sending an e-mail to Pam
22  Lake, and what was the e-mail address that you used
23  for Pam Lake?
24     A.    HNLMNG at Maersk dot com.
25     Q.    Okay. Those are the same first six

Page 188

1  initials as appear in the from line from this
2  e-mail, Exhibit 17, that we are looking at, correct?
3      A.    The first six initials are the same, but
4  that's it, and both addresses are different.
5      Q.    Well, they don't have --
6          None of these addresses have the at
7  Maersk dot com conclusion, do they, on Exhibit 17?
8      A.    That's correct.
9      Q.    Now, let me just ask you, Pam Lake
10  responded to your request to get what those accruing
11  charges might be, didn't she?
12     A.    Well, Exhibit 17 apparently seems to be
13  mailed from Pam Lake, not so much because of the
14  question of the e-mail address where this originated
15  from, but she used to call me Hanni, and she signs
16  it with Pam, so that's pretty evident.
17     Q.    Okay, and so in this e-mail, correct me
18  if I am wrong, she is telling you the following are
19  the outstanding charges for these two bills of
20  lading that we have been talking about, right, 2109
21  and 1026, and she is sending you the charges in
22  response to your inquiry from the day before that
23  she would give you these charges, right?
24     A.    Yeah.
25     Q.    And then at the bottom half of this

Page 189

1  e-mail below that double broken solid line and
2  continuing on to the second page of the e-mail, she
3  is providing you with those accruing charges that
4  you had asked for, is that what that is?
5      A.    That's correct.
6      Q.    And she breaks them down by bill of
7  lading number and then describes to you what the
8  free time is, what the change of destination fee is,
9  late declaration charges, and then the increasing
10  demurrage charges based on the number of days; is
11  that correct?
12     A.    That's how I read this as well.
13     Q.    And she also provides you with the
14  exchange rate to convert the Hong Kong dollars into
15  US dollars?
16     A.    Well, that's what I recognize here as
17  well.
18     Q.    What did you do with this information
19  when you received it?
20     A.    I probably forwarded it -- if I received
21  it, I probably forwarded it to Hong Kong, but --
22  because Hong Kong was supposed to pay all these
23  fees.
24     Q.    Did you ever have a -- well, let me step
25  back.

48 (Pages 186 to 189)

Page 194

1  this whole additional charges business.
2      Q.    Okay, and now, actually, tell me what it
3  is that you are telling Maersk in this e-mail.
4      A.    Yeah, that I agreed that these charges
5  are to be paid by us.
6      Q.    Okay, and so I get your portion of the
7  text correct, you say, quote, we have already agreed
8  previously in writing to accept any additional
9  charges, even without knowing how much they are,
10  simply to get moving and to get out of this hole?
11      A.    Yeah, see, and this is all here a big
12  mess which I put myself into it because we agreed to
13  additional charges sailing under the assumption
14  which now is biting me that, okay, these charges
15  will be borne in Hong Kong, and Hong Kong walked
16  away from it. This is a fact. Even without knowing
17  how much they are, so how in the world would I make
18  as a businessman such a booboo if I would not rely
19  on the fact, okay, they will be paid in Hong Kong?
20          See, here is the dilemma. I mean,
21  obviously, I am looking like a jerk here, but I was
22  always under the assumption that if Hong Kong, who
23  agreed to pay these fees, will not get the
24  merchandise after they paid me, after they paid tens
25  of thousands of dollars, if they do not pay these

Page 195

1  thousands of dollars, they will not get the
2  merchandise, so I was under the wrong security
3  cushion that if they want the cargo, they have to
4  pay for the fees, which they told me they would do,
5  so I exposed myself huge.
6      Q.    Okay, if I could continue with what you
7  said, because I think the next sentence is really
8  key, quote, we herewith confirm again that any
9  diversion charges and possible demurrage will be
10  accepted by us being your contractual partner.
11      A.    Okay.
12      Q.    We will -- I'm sorry, I misspoke.
13          We then will settle internally with our
14  client in Hong Kong who has caused the diversions.
15  I hope this clarifies matters, end quote.
16          So you are saying you don't know what
17  the total amount of demurrage and diversion is
18  because it continues to accrue as Pam told you in
19  her February 4 e-mail, but you are telling Maersk,
20  we will take care of it, we are good for it, and we
21  are going to settle up with our customer who caused
22  all of these problems in China. That's what you are
23  saying, right?
24      A.    Yep, put myself in a big hole here.
25      Q.    Did Maersk have the right to rely on the

Page 196

1  things that you are telling him in this e-mail?
2          MS. FARIAS:  I am going to object to
3  that as speculation and calls for a legal
4  conclusion.
5      Q.    (By Mr. Kugle)  Were you hoping that
6  Maersk would act based on your representation in
7  this e-mail?
8      A.    What do you mean?
9      Q.    Did you expect that Maersk would read
10  what you said to it and do something in response to
11  what you were telling Maersk?
12      A.    Do something?  What?
13      Q.    Well, I'm not sure. Pam Lake is telling
14  you we need written acceptance of the outstanding
15  charges before we can proceed with releasing this
16  cargo or finalizing these papers, and you are
17  saying, and I don't want to put the words in your
18  mouth, you are saying, Pam, we confirm again that
19  diversion charges and possible demurrage will be
20  accepted by us, being your contractual partner. We
21  will then settle internally with our client in Hong
22  Kong who has caused the diversions, so you are
23  saying, Pam, don't worry, we will take care of it,
24  and we will settle with our customer. You go ahead
25  and prepare the papers.

Page 197

1      A.    Okay, what I am saying is I do not deny
2  what I said here in the e-mail to Pam Lake.
3      Q.    Okay. Let's move on to the next one.
4          MR. KUGLE:  Let me have this one marked
5  as Exhibit 19.
6          (Deposition Exhibit 19 was marked for
7          identification.)
8      Q.    (By Mr. Kugle)  Is Exhibit 19 also your
9  e-mail?
10      A.    Yeah.
11      Q.    Now, again, we are still talking about
12  the same two bills of lading, 2109 and 1026, because
13  that's in the subject line, correct?
14      A.    Correct.
15      Q.    Now, unlike other ones, I think -- well,
16  no, you tell me. Is this all your text here, or, in
17  other words, the bold and the unbold is all your
18  words?
19      A.    Yeah.
20      Q.    And who are you sending this message to?
21      A.    As you can read above, to recipients in
22  Hong Kong and a whole bunch of people in the Maersk
23  organization.
24      Q.    Okay, so it's going actually both to
25  people at Maersk, and anybody who has that Sinograd

50 (Pages 194 to 197)

Page 206

1  reading this Exhibit 14.
2      Q.    Now, ultimately, these two bills of
3  lading that we have looked at, Exhibits 5 and 7, and
4  which you did not understand the presence of the
5  import demurrage charges, you do recognize, though,
6  that those are included on there because you told
7  Maersk time and time and time again in these e-mails
8  we are going to be responsible for that?
9      A.    I don't deny what I have read here on --
10  on several of these exhibits.
11     Q.    And your goal was to tell Maersk that so
12  that the cargo would be released --
13     A.    To be --
14     Q.    -- to Jade Alliance?
15     A.    -- released, expedited, and out of the
16  circle of sitting in port and not getting moved.
17     Q.    And as a result of your telling Maersk
18  that, the cargo was released, correct?
19     A.    Eventually, cargo was released, yes, the
20  way I -- whereas I was under the impression right or
21  wrong that cargo will not be released until all fees
22  will be paid. Since I knew that I paid all my
23  normal freight rates, I had reasons to believe that
24  Maersk would not let the seven and thirteen
25  containers go out either from Hong Kong or Chiwan

Page 207

1  until all expenses are paid, so I may have been
2  under a monster of a misconception, but this is what
3  apparently happened.
4          You see, normally, Maersk or any other
5  shipping company will not release any cargo, one or
6  fifteen containers, if there are still fees to be
7  paid. That's the way it is, and that's why I was
8  stunned when I realized the containers -- well, I
9  did not receive any more information containers are
10  still in the pipeline or still not released, and
11  that this contract, so to say, came to an end, to a
12  conclusion, so I haven't heard anything of it until
13  I received this big -- the big demand, and then
14  that's when I realized something went very wrong,
15  containers were released, and there still were
16  charges against these containers or against these
17  two bills of lading.
18     Q.    And those were the same charges that you
19  had said in these various e-mails that Hartmann
20  Metals was going to be responsible for?
21     A.    Under the assumption, okay, we are
22  responsible for it because I know my contractual
23  partner will pay for it.
24     Q.    Did you go back to your contractual
25  partner and ask for the money?

Page 208

1      A.    Well, I went back to him and said, look,
2  this was our agreement, you agreed to pay directly
3  in China for all of these diversions and show --
4  after I got hit with that invoice from Maersk or
5  that demand with the statement, and they were not
6  able to give me precise answers. That's when I
7  realized that something went terribly wrong. See,
8  at that time I asked, well, since -- and they told
9  me, yes, everything is taken care of, everything is
10  fine. Fine, then show me either return checks or
11  your bank advice that you did pay Maersk for this
12  circus which happened with these basically two sets
13  of containers, and that information was not really
14  supplied to me.
15         So to conclude, the assumption which I
16  sailed under for thirty years that no container in
17  China or in England or anywhere will be released
18  until it's completely satisfied, it's wrong because
19  what apparently happened over there in China is that
20  -- I will say it as it is -- somebody bribed some
21  people over there to get the containers out, even if
22  they were not free, even if some fees, quite a lot
23  of fees were not paid. Otherwise, containers can
24  not go out.
25     Q.    Now, are you suggesting that Maersk was

Page 209

1  bribed to release the containers?
2      A.    I am suggesting that somebody was bribed
3  to let containers go out.
4      Q.    Somebody from Maersk?
5      A.    I wouldn't be surprised. I can not
6  prove it.
7      Q.    Do you have any evidence at all about
8  that?
9      A.    The evidence is the fact that how can
10  containers go out when there is still a hold on
11  these containers because there are still fees to be
12  paid to release these containers?
13     Q.    And, of course, we are ignoring the five
14  or six e-mails that we just walked through where you
15  told Maersk, don't worry, release it, I'll pay for
16  it, correct?
17     A.    I will again say that I acknowledge that
18  these mails were exchanged.
19         MR. KUGLE: Let's mark this next one as
20  Exhibit 21.
21         (Deposition Exhibit 21 was marked for
22         identification.)
23     Q.    (By Mr. Kugle) When you have had the
24  opportunity to review that, tell me if that looks
25  familiar to you.

53 (Pages 206 to 209)

Page 210

```
 1        A.     It's again a copy of a bill of lading
 2  apparently covering a shipment from us to China
 3  again from Hilo.
 4        Q.     Now, one has total prepaid freight
 5  charges of $11,539.81, do you see that?
 6        A.     Yeah, and this is also somewhat a
 7  discrepancy of about $1,000 because this freight
 8  bill here uses a base rate which is higher than the
 9  one which we originally agreed upon and which is
10  apparently reflected in the original freight bill
11  when this shipment was executed.  This list of
12  invoices received shows the next to the last,
13  February the 2nd, same bill of lading number 45274,
14  45274, the invoice which we originally received of
15  10,700 and some change, and this one now shows
16  11,500 and the difference is that we are charged
17  here a base freight rate of $100 more than we showed
18  previously.
19        Q.     Let me find what you are referring to.
20  You were talking now -- you were looking at Exhibit
21  Number 1, is that --
22        A.     Exhibit number, that's correct.
23        Q.     Okay, which was Dora's June 2, 2004,
24  e-mail?
25        A.     Right.
```

Page 211

```
 1        Q.     And in that one, you were pointing to an
 2  invoice with the same number, 5274.  Where is that?
 3        A.     Next to the last bill of lading --
 4        Q.     Okay.
 5        A.     -- is 10,700, and this one is 11,500, so
 6  there's a difference of 750, $800 and some of the
 7  difference originates from a different freight rate
 8  which is shown here on this document versus the
 9  corresponding earlier document.  This happened a few
10  times that shipments were charged at the rate which
11  was not negotiated.
12        Q.     Okay.  Now, what can you point me to to
13  see the original rate that was negotiated?
14        A.     First of all, the invoice amount here
15  and what Dora shows on her list is slightly lighter,
16  and I do recall that we worked for quite some time
17  at figuring at 1350 and not at 1450, so that is
18  still in my memory pretty clear.  The other fees
19  which are shown here are probably more or less
20  correct.  I remember that clearly because it
21  happened a few times that we agreed on a freight
22  rate, and then a different freight rate was charged
23  which added to the confusion and the frustration and
24  back and forth and hick and hack and up and down.
25        Q.     Right.  Now, I am trying to get at where
```

Page 212

```
 1  is the document that shows the original negotiated
 2  freight rate that would be different from this one?
 3  In other words, you know, you had described to me
 4  the booking.  Do you have any copy of any booking or
 5  anything from Maersk saying that they would
 6  guarantee the freight rate to be in effect whenever
 7  you chose to make the shipment at $1,350?
 8        A.     I would probably have to go back to our
 9  files and dig up here this bill of lading showing a
10  different total amount because Dora simply takes the
11  invoices which she receives and posts them, so if
12  she would have received this amount, she would have
13  posted 11,500 and not 10,750.
14        Q.     During this time period, and I think
15  this bill of lading is January 27th, 2004, was there
16  an increase in the tariff rates for what Maersk
17  charged for steel scrap bundles?
18        A.     I do not know that.  The tariff and the
19  freight expenses are subject to change all the time,
20  but not when a deal is negotiated or agreed upon for
21  X amount of containers, and it is confirmed for
22  either for so many containers or for so many weeks.
23        Q.     Well, okay, and I guess that's where I
24  am uncertain because my understanding of the
25  industry was carriers do not commit to hold open or
```

Page 213

```
 1  to give quotes that are binding.  In other words,
 2  all of their quotes typically will say if you were
 3  to ship today, this is what the cost would be,
 4  however, you know, when you ship, it will be the
 5  tariff rates in effect on the day that you deliver
 6  the containers to us --
 7        A.     No.
 8        Q.     -- and you were testifying as I
 9  understood it about your understanding of the
10  industry, and I am trying to say do they send you
11  something that says here is our quote, it is good,
12  it is locked in for sixty days, it is locked in for
13  six months, whenever you decide to tender these
14  containers to us, as long as they contain this type
15  of cargo, it will be at that rate, is there such a
16  thing?
17        A.     Well, there is such a thing that the
18  shipping lines and even Maersk agreed to -- not to
19  my knowledge to a period of up to six months but
20  usually to four weeks to eight weeks.
21        Q.     Okay.  So in other words, and I guess
22  now in dealing with this particular invoice, it's
23  Maersk's contention that this has not been paid in
24  full, but they have, of course, looked to the amount
25  that's on the face, and you are saying, well, I
```

54 (Pages 210 to 213)