```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF HAWAII
 3    -------------------------------------------
 4    MAERSK INC.,
 5
 6              Plaintiff,
 7
 8       vs.                CIVIL NO. 04-00652 (HG/BMK)
 9
10    HARTMANN METALS
11    CORPORATION,
12
13              Defendant.
14    -------------------------------------------
15
16          DEPOSITION OF JEFFREY BRUCE FORREST
17
18          Taken on behalf of the Plaintiff, at the
19    office of Damon Key Leong Kupchak Hastert, 1600
20    Pauahi Tower, 1001 Bishop Street, Honolulu, Hawaii,
21    commencing at 9:11 a.m., on November 16, 2005,
22    pursuant to Notice.
23
24    BEFORE:   SHARON H. COSKEY, CSR NO. 359
25             Certified Shorthand Reporter
```

Page 30

1  invoice. And then we pay that invoice to them, say,
2  for instance, Alliance.
3       And my understanding is that their invoice
4  is so many dollars more per container than the line
5  itself would charge, and so they're taking their fee
6  from that total and then paying the shipping line.
7       Q.  That's what I understood they do, also, and
8  I wanted to be clear.
9       So when they quote you a freight rate, the
10 freight rate that they give you, for instance, is not
11 going to be Maersk or NYK or anybody else's tariff
12 rate for that transportation, but it will instead be
13 Alliance Logistics' rate that has built in its own
14 profit, correct?
15      A.  I'd say more specifically it's actually the
16 shipping rate's rate -- shipping line's rate plus
17 their commission on top of it.
18      Q.  Okay. And do they tell you, I mean, on
19 their invoice does it show the breakdown?
20      A.  It does not.
21      Q.  Does the ocean carrier or Alliance provide
22 you with an advance copy of the freight invoice or
23 the freight bill or the bill of lading, where you
24 could simply look and see, oh, here's what NYK is
25 charging for this move, and then I can determine the

Page 31

1  difference?
2       A.  No, generally not. We're not able to
3  determine what commission they're making.
4       Q.  And is that because since you've been
5  involved, you no longer look at bills of lading or
6  proof of copies of bills of lading or freight bills;
7  instead, Alliance handles that?
8       A.  No. We specifically have to review and
9  approve every bill of lading; I do, specifically.
10      Q.  But those bills of lading that you look at
11 don't have a breakdown of the charges that are being
12 paid?
13      A.  That's correct.
14      Q.  Is that --
15      A.  Even if they do, they reflect -- I'm trying
16 to actually recall that.
17      All I can say is looking at the bill of
18 lading presented to us, which is generally a proof
19 bill of lading initially, there's not a breakdown
20 that would allow us to see what the commission is
21 being charged by the shipping agent.
22      Q.  Do you have any understanding about whether
23 prior to your employment with Hartmann Metals,
24 Hartmann Metals operated differently; in other
25 words -- and by "operated differently" I'm talking

Page 32

1  about the payment process to the ocean carrier -- in
2  other words, making direct payments from Hartmann
3  Metals to Maersk and bypassing any, any logistics
4  entity or freight forwarder?
5       A.  The way I'd answer that is that when I
6  joined the company, we had a pre-existing
7  relationship with the shipping agent. I wasn't
8  creating this relationship.
9       So my assumption and my recollection is
10 that they were operating, basically, in the same
11 fashion, making bookings through a shipping agent.
12      Q.  Okay. Did Hanni ever tell you that at some
13 point prior to your arrival, things were a mess,
14 maybe from an accounting standpoint, from an ability
15 to track payments, to know what invoices were coming
16 in or being paid, and that that was the source of
17 problems? Did he ever tell you anything like that?
18      A.  Not like that; not the way that you're
19 phrasing it.
20      Q.  How would he have phrased it?
21      A.  I think the only thing that Hanni said to
22 me is that his business was really starting to grow,
23 and it's getting to the point where he needs some
24 assistance in terms of handling administrative
25 matters.

Page 33

1       Q.  Hanni travels frequently?
2       A.  Correct.
3       Q.  Is part of your -- is it your understanding
4  that part of the reason maybe why he hired you is so
5  that there could be a body on the ground here to
6  handle these things when he is perhaps traveling or
7  not, not in communication?
8       A.  I'm not sure if I understand that question.
9       Q.  Well, do you have any understanding that he
10 wanted you to come in to take care of the details and
11 to follow through on these things that he might not
12 be able to do because he's traveling or because he's
13 involved in negotiating other deals?
14      A.  Well, I'm an administrative assistant, so I
15 came in to administrative support.
16      Q.  I understand that. Had there been a prior
17 administrative assistant?
18      A.  When, I believe, Hanni worked in Germany,
19 he had several, at least one or two administrative
20 assistants at some point in time.
21      Q.  But how about at Hartmann Metals here in
22 Hawaii, doing this business?
23      A.  My understanding, there was no prior
24 administrative assistant.
25      Q.  How many other employees does Hartmann

9 (Pages 30 to 33)

Page 34

1  Metals have other than yourself and Hanni?
2     A.  It's basically us.
3     Q.  And do you know at any time prior, prior to
4  this, prior to your employment, whether there was
5  anybody else that was in any function with Hartmann
6  Metals as another employee? I mean, was Hanni solo
7  before that? What's your understanding?
8     A.  My understanding, that he was basically
9  solo. He may have tried to get some assistance
10 before and the person didn't work out. I'm not sure.
11         MR. KUGLE: All right. Let's take a
12 look at some exhibits. Let's have this one marked as
13 Exhibit 1 to Mr. Forrest's deposition.
14 (Deposition Exhibit 1 marked.)
15 BY MR. KUGLE:
16    Q.  Why don't you take a minute to review that,
17 and then I'm going to ask you if you know what that
18 is.
19    A.  Well, I remember it as, basically, one of
20 the letters that I was asked to, or e-mails that I
21 was asked to contact Pam Lake with, which was
22 reviewed by Hanni and dictated.
23    Q.  And is this -- this is actually a series of
24 e-mails, it looks like, originally between Hanni and
25 Pam and then which you became involved with?

Page 35

1     A.  Yeah. My understanding was that he had
2  been in contact with Pam Lake, and he thought that
3  she was the person here to try to resolve some of
4  these issues. So that's how she was described.
5         He met with her before, you know, in
6  person, and knew who she was and was trying to
7  resolve these issues through contact with her.
8     Q.  What was your understanding of what you
9  were being asked to do by Hanni with this
10 September 1st e-mail?
11    A.  Once again, this is just -- if you look at
12 the September 1st, I was there for two weeks. I
13 mean, it's like, as I described before, I didn't know
14 what a bill of lading was, I didn't know what a
15 letter of credit was or anything when I walked in the
16 door two weeks prior to this.
17        So, basically, this is me, just on Hanni's
18 direction, writing short letters to Pam at his
19 dictation.
20    Q.  Okay. And when you say -- in your message
21 to Pam, you say, "We are having a problem in China
22 with Maersk trying to add additional fees, above
23 those agreed to." Your understanding is that's,
24 Hanni told you that that's what's happening and he's
25 asked you to try to resolve this?

Page 36

1     A.  Correct. My only understanding was that
2  Hanni had prior communication with Pam on these
3  issue, I don't know if this container or containers,
4  and there was some sort of agreement, final
5  agreement, on price that Hartmann Metals would pay
6  and then the issue would be done.
7         But I think he was trying to go back to
8  that prior time with her to say, listen, you did say
9  this was going to be the final charge, but now we're
10 getting more fees. That's my understanding.
11    Q.  In the subject line it says "Contract 364."
12 Can you tell me what that refers to?
13    A.  Well, every time we started a new contract,
14 it's simply the next number, and so this is a
15 contract well before my time. It was just number
16 364.
17    Q.  Okay.
18    A.  File number 364.
19    Q.  And that refers to a contract between
20 Hartmann Metals and a customer?
21    A.  Yeah, customer and supplier both. So,
22 basically, when a contract is put together, it's
23 assigned the next number, in this case 364, and
24 there's going to be a contract 364 purchase, there's
25 going to be a contract 364 sale.

Page 37

1         MR. KUGLE: Now I'm going to have you
2  look at another e-mail. Have this one marked as
3  Exhibit 2.
4  (Deposition Exhibit 2 marked.)
5  BY MR. KUGLE:
6     Q.  Before you actually look at Exhibit 2
7  there, on Exhibit 1, which we just finished looking
8  at, there's some, it looks like some highlighting
9  marks on the left-hand side. Whose markings are
10 those?
11    A.  I have no idea.
12    Q.  In looking at this e-mail, can you tell
13 where it came from, in other words, not who sent the
14 e-mail, but where this copy may have come from?
15        And I might direct you maybe to the last
16 line at the bottom of the page, at the bottom of the
17 first page.
18    A.  Last line, first page. Which line are you
19 referring to?
20    Q.  Well, I read, "Wednesday, November 17,
21 2004, America Online," colon, it looks like
22 Schrottman?
23    A.  Right.
24    Q.  Is that a reference to an e-mail account
25 for Hanni Hartmann?