Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3   MAERSK, INC.,              )  CIVIL NO. 04-00652

 4            Plaintiff,        )   (HG/BMK)

 5        vs.                   )

 6   HARTMANN METALS CORPORATION,)

 7            Defendants.       )

 8   _____)

 9

10            DEPOSITION OF DORA M. MATSUMURA

11   Taken on behalf of Plaintiff at the Law Offices of

12   Damon Key Leong Kupchak Hastert, Bishop Square,

13   Pauahi Tower, Suite 1600, 1001 Bishop Street,

14   Honolulu, Hawaii  96813, commencing at 9:10 a.m., on

15   November 17th, 2005, pursuant to Notice.

16

17

18

19

20

21

22

23   BEFORE:   PATRICIA ANN CAMPBELL, CSR 108

24             Certified Shorthand Reporter

25             Notary Public, State of Hawaii
```

Page 26

1    Did it take some time to work on, and
2 then it was dated as a final product on April 5?
3    A.   I think it took time to get the
4 information so that I could come up with this April
5 5th memo to Andrea Jinks.
6    Q.   Okay. Tell me as accurately as you can
7 recall exactly what it is that Hanni asked you to do
8 that prompted you to prepare this?
9    A.   To reconcile with Andrea and make sure
10 that everything was paid.
11   Q.   Okay.
12   A.   That's why on the second page it says I
13 will suggest to Mr. Hartmann that he should release
14 the 18,875.36 to clear the account. That would be
15 everything that was received, and everything that's
16 sold.
17   Q.   Okay. Do you remember whether Hanni
18 asked you to do this over the telephone or in
19 person?
20   A.   I don't know.
21   Q.   Okay. Did he hand you documents to
22 assist you with this, or would those have already
23 been in your file?
24   A.   This information would already be on his
25 computer.

Page 27

1    Q.   Okay, so you simply had to access his
2 computer, pull off the information from the accounts
3 payable, and then summarize it here?
4    A.   Right.
5    Q.   Did you have to go back to Hanni to ask
6 for additional information that wasn't already in
7 the computer?
8    A.   I don't remember. By looking at this
9 list, at this point I had all the invoice numbers,
10 so I would say the information was there when this
11 was done. If not, I would not have the invoice
12 numbers.
13   Q.   Okay. You actually had copies of the
14 invoices, right, that you were working off of?
15   A.   To input, yes.
16   Q.   Okay. So originally when the invoices
17 would come in from Hanni to your office, you would
18 input that into the computer, and then you filed the
19 invoices in your file that you hold until year end?
20   A.   Right.
21   Q.   I asked that because in the second
22 paragraph you say I am sending you copies of the
23 original freight invoices that you sent us. When
24 you are saying to Andrea that you sent us, you are
25 talking about your original invoices that Maersk had

Page 28

1 sent to Hartmann Metals --
2    A.   Right.
3    Q.   -- at some previous time when they were
4 arranging the transportation?
5    A.   Right.
6    Q.   Okay, and then those are the same
7 invoices that Hanni then sends to you so that you
8 can input it into the computer?
9    A.   Right.
10   Q.   And then you store them in your files
11 until you return them to him at the end of the year?
12   A.   Right.
13   Q.   Okay, and so in this case, you were
14 actually sending back to Andrea copies of all of
15 these freight invoices that you have listed -- well,
16 actually, I was going to make a statement, but I
17 don't think that's true. You sent her only three
18 invoices back, or did you send her all of these
19 invoices?
20   A.   I don't remember what I sent her.
21   Q.   Okay. I mean, my question was because
22 of the last three on the invoice column, I have that
23 parentheses, copy attached.
24   A.   Copy attached. Could be that Hanni sent
25 her the three.

Page 29

1    Q.   Okay. Now, when you sent this document,
2 this memo to Andrea, it was a clean copy, correct?
3 I mean, it did not have all of your handwritten
4 notations on the side?
5    A.   Yes.
6    Q.   Those you added later --
7    A.   Yes.
8    Q.   -- in a telephone conversation?
9    A.   (Witness nods head up and down.)
10   Q.   Okay, and what you were attempting to do
11 with this was to try to determine the total amount
12 invoiced by Maersk, the total amount of payments
13 from Hartmann to Maersk, and the underpayment or
14 overpayment, if any, is that what you were trying to
15 do?
16   A.   Right.
17   Q.   And that's what Hanni asked you to do?
18   A.   Right.
19   Q.   What kind of parameters did Hanni
20 provide you? Did he say do it from a certain date,
21 for instance? Did he say, you know, bring it up to
22 current or anything like that?
23   A.   When he asked me to do this, it's
24 balances as of today, in other words, current.
25   Q.   So this brought it current as of the

Page 30

1  date, basically, the date that you prepared it,
2  April 5?
3     A.  Right.
4     Q.  Did Hanni tell you to exclude shipments
5  before October of 2003?
6     A.  No.
7     Q.  How come you didn't include any before
8  October, 2003?
9     A.  Because it's not on this. It's not on
10 the accounts payable system. Before this, I don't
11 even know if there was any transactions before this.
12    Q.  Did Hanni begin using a new computer
13 system at this time in October of 2003?
14    A.  I think that's when this Quick Books
15 process started.
16    Q.  Did he have a prior computerized --
17    A.  No.
18    Q.  -- accounting software before that time?
19    A.  (Witness shakes head from side to side.)
20    Q.  So before the fall of 2003, how did you
21 do your bookkeeping for him?
22    A.  It was all manual.
23    Q.  So you would log down things in a ledger
24 book?
25    A.  Manual meaning you have your basic check

Page 31

1  register which shows money in and out, your cash
2  basis system.
3     Q.  So you would keep the check register, or
4  he would?
5     A.  He would.
6     Q.  Okay. Prior to the time when he went on
7  the computerized system, you were still doing the
8  bookkeeping for him, though?
9     A.  Yes.
10    Q.  Do you have any recollection about prior
11 transactions with Maersk before this October, '03,
12 date?
13    A.  I don't know.
14    Q.  Now, as I went through this, I am
15 looking at the columns themselves in the invoice
16 column rather than the paid column. The second
17 entry must be a mistake; is that right? It has a
18 date of November 4, 2004.
19    A.  Yes.
20    Q.  Okay, and you simply transposed the
21 years?
22    A.  That's correct.
23    Q.  It should have been 2003?
24    A.  Yes.
25    Q.  Okay, and that's because you did these

Page 32

1  in chronological order?
2     A.  Right.
3     Q.  Okay, and also November, 2004, hadn't
4  happened yet?
5     A.  Yes.
6     Q.  Okay. Before we talk about some of the
7  numbers, I wanted to understand what it is that
8  Andrea had sent to you. Did you have a conversation
9  with Andrea prior to preparing this memo?
10    A.  Yes, and she couldn't -- we couldn't
11 reconcile it. Her numbers were a little bit
12 different at this point, and she was confused, so
13 that's why I made it this way to make it easier for
14 her to understand this is what I am showing, this is
15 what I am showing as paid. I don't know what your
16 numbers are. So this was at this point to show,
17 okay, we tried talking, you are confused, so I am
18 giving it to you. Now you match it and then call me
19 back.
20    Q.  Okay, I see, so there was a conversation
21 where the two of you verbally tried to sort this
22 thing out?
23    A.  Right.
24    Q.  And then you went and put it on paper?
25    A.  Right.

Page 33

1     Q.  Okay, and even in that prior
2  conversation, that was after Hanni had asked you to
3  try to sort this out with Andrea, right?
4     A.  Right.
5     Q.  Okay. Now, I didn't quite understand
6  your statement in the second paragraph. You say
7  your, quote, nonnegotiable, end quote, copies don't
8  even add up correctly by themselves. What did you
9  mean by that?
10    A.  There had been at least -- see, there's
11 a lot of copies that come in for one bill of lading.
12 There's one copy that's stamped nonnegotiable. They
13 have a copy that's stamped original, copies that are
14 stamped copy, but when I added up the nonnegotiable
15 copies, the invoice amounts in detail, it didn't
16 come up to the total of what she said, so that's why
17 I said I don't know why -- how she can be trying to
18 balance if the copies themselves didn't balance.
19    Q.  Okay, and so prior to this, she had been
20 saying to you our records show that Hartmann Metals
21 owes us money, right?
22    A.  Right.
23    Q.  Okay, and you were saying that based on
24 the certain copies of the freight invoices, they
25 don't even total to what you are saying they are

Page 38

1  about what happened with this memo, Exhibit 2. You
2  sent this to Andrea; is that correct?
3     A.   Yes.
4     Q.   And then did Andrea call you, did you
5  call Andrea, or did Hanni ask you to speak with
6  Andrea to talk through this?
7     A.   Andrea called me, and she couldn't reach
8  me, so I called her back, and for a couple of days
9  we were going back and forth trying to reach each
10 other.
11    Q.   Okay. I guess you two were probably
12 also exchanging e-mails about trying to touch base
13 and walk through this thing; is that right?
14    A.   No. Andrea wanted to talk in person.
15 After this was sent, the statement for the 5th memo
16 was sent to her, she wanted to talk in person, so we
17 went through each invoice to see where the
18 difference was. That's where we had agreed -- she
19 had agreed with me there was a problem with
20 receiving the original bill of lading on some of
21 these invoices, one or two of these invoices, and
22 because we couldn't get the original bill of lading,
23 our client couldn't pick up the merchandise because
24 that's what they need to get the merchandise from
25 Maersk from wherever they were.

Page 39

1     Q.   Okay.
2     A.   Okay, so the original bill of ladings
3  were delayed. In the meantime, stuff sat on docks
4  or wherever it sat because the ship already arrived,
5  so Andrea and I -- she agreed with me that from the
6  time the ship arrives until we actually got the
7  original bill of ladings, I remember Mr. Hartmann
8  calling asking where is the original bill of ladings
9  because the client is asking for it? And we
10 couldn't do -- well, not we. He couldn't do
11 anything because it's a matter of getting it from
12 Maersk and getting it to the client because the
13 client was getting upset because they didn't have it
14 to get the merchandise.
15    Q.   Okay, let me stop you there because you
16 corrected yourself. You said we, but this is all
17 actually stuff that he is doing, and then he is
18 telling you what happens in his business, correct?
19    A.   Right.
20    Q.   Because, I mean, the clients weren't
21 calling you about --
22    A.   No, they were calling him.
23    Q.   Okay.
24    A.   So he was calling, so that's where he
25 got me involved to help try to solve the problem so

Page 40

1  original bill of ladings can come smoother in the
2  future, so we are trying to solve the problem
3  wherever the problem is, okay? But in the meantime,
4  the ship arrived, and the merchandise sat. The
5  original bill of lading finally came. The original
6  was expressed over to destination so the client can
7  get the merchandise.
8          At that time when I did talk to Andrea,
9  we were going through this, she agreed with me from
10 the time the ship arrived until the original bill of
11 ladings were received so that they could get the
12 merchandise, that Hartmann would not be responsible
13 because it wasn't his fault that the original bill
14 of ladings was late.
15    Q.   Okay, and Hanni told you it wasn't his
16 fault that the original bill of lading was late?
17    A.   I don't know what the reason was.
18 Andrea agreed that it was not Mr. Hartmann's fault.
19    Q.   The handwritten notations on this were
20 added as you had your telephone conversation with
21 Andrea; is that right?
22    A.   Right.
23    Q.   Okay. I wanted to talk about trends,
24 and then we will talk about some specific numbers on
25 this. The trend I kind of noticed was that -- well,

Page 41

1  a couple of things. First off, you don't have a
2  direct correlation between an invoice amount and a
3  payment amount. Is that a correct observation?
4     A.   At the beginning of this account, I
5  should say, I remember Mr. Hartmann saying that he
6  went to talk to the local agent here physically, and
7  they had come up with an estimated amount of what
8  the freight would be because Mr. Hartmann didn't
9  want shipments to be delayed because of money, so on
10 October 26th that $84,581 was given to Maersk, was
11 sent to Maersk for prepayment of shipments to come
12 so that it wouldn't be delayed.
13         After that, it was always -- the month
14 of December it was in increments of money saying --
15 okay, during the month of December, four payments
16 was made saying monies was needed for additional
17 shipments, so it was paid. It just didn't correlate
18 to any one specific invoice. It was an estimated
19 amount that was given. Then after that, several
20 payments would be made specifically for certain
21 invoices. Like the $6,430 wired on December 9th was
22 specifically to pay off this invoice number
23 SGIT41974.
24    Q.   Okay, let me back you up because I
25 didn't quite understand one part of it. You said

Page 42

1  that there had been four payments made in December,
2  but I think what you were talking about is if you
3  look down on the bottom half of this memo on the
4  first page under the columns called total -- just
5  below total invoice, and then there's your payment
6  columns, right?
7       A.   Right.
8       Q.   The first payment is by check on October
9  26th for $84,000 and change, right?
10      A.   Right.
11      Q.   And then you said there were four wire
12 transfer payments in December that didn't have a
13 correlation to any invoices.
14      A.   I'm sorry. Actually, five.
15      Q.   Okay, that was really my question.
16      A.   Yeah.
17      Q.   So the first five that were wired on
18 December 9, and there's no total on those, but
19 approximately $85,000, am I doing that math kind of
20 correctly?
21      A.   Approximately 80,000.
22      Q.   All right.
23      A.   I can't write on this. I can't think.
24 I need a calculator. I would say --
25      Q.   Okay, over 70 to $80,000 --

Page 43

1       A.   Yes.
2       Q.   -- that were not tied to an invoice, I
3  mean, not tied directly in terms of sum to an
4  invoice, they don't correspond precisely to
5  something on the top half of the page?
6       A.   Correct.
7       Q.   Going back to that check, I did not
8  understand that exactly. The purpose of that, Hanni
9  told you that that was a prepayment? A prepayment?
10      A.   Right.
11      Q.   Okay. In other words, he told you that
12 that was not a payment for invoices and shipments
13 that had been made prior to October 26th?
14      A.   No, no. That was this check number 1800
15 was made specifically for this contract.
16      Q.   Okay, and when you say this contract,
17 you mean when he --
18      A.   For these invoices.
19      Q.   For that set of invoices that starts
20 October 28th, 2003, for all of these, you mean?
21      A.   For up to -- let's see. I can't
22 remember if all of these invoices were for one
23 contract. He has contracts with his client, okay?
24      Q.   Okay.
25      A.   But this check was made for that

Page 44

1  specific contract for that client.
2       Q.   Okay. Does he note on his checks who
3  the client is for or what the contract is?
4       A.   Yes.
5       Q.   Okay, maybe I can have you take a look
6  at Exhibit 2 to Mr. Hartmann's deposition.
7       A.   Okay.
8       Q.   You are looking at a copy of the $84,000
9  check, correct?
10      A.   Right.
11      Q.   Now, where on there can you determine
12 what contract or what shipments that might be for?
13      A.   This one I can't, not on the check.
14      Q.   And why is that?
15      A.   Because it's not here.
16      Q.   Okay, so normally somewhere in the body
17 of the check there would be a notation?
18      A.   On my register.
19      Q.   On your check register?
20      A.   Right.
21      Q.   Okay, and this is a copy of the check
22 itself or a copy from the check register?
23      A.   No, this is a copy of the actual
24 cancelled check.
25      Q.   Okay, so Mr. Hartmann's check registers

Page 45

1  would have an indication of -- would they indicate
2  what invoice he is paying --
3       A.   No.
4       Q.   -- by invoice number?
5       A.   (Witness shakes head from side to side.)
6       Q.   Just what contract with his customer?
7       A.   The invoice themselves would tell me
8  what contract it is.
9       Q.   The Maersk invoice?
10      A.   The Maersk invoice.
11      Q.   But --
12      A.   It tells me what purchase order.
13      Q.   Well, okay, it would not -- okay, it
14 would tell you the consignee or the notify party, in
15 other words, the customer that it is going to, but
16 it would not have Mr. Hartmann's contract number --
17      A.   It does.
18      Q.   -- on it?
19      A.   That was part of the information that is
20 supposed to be on the body someplace where it says
21 -- it tells me, what is it, PO number, contract
22 number, because that's how the client would
23 distinguish what shipment he is getting for which
24 client. For instance, Mr. Hartmann had more than
25 one contract with the same client. You had to tell

Page 46

1  the client this container is full. Which contract?
2  The bill of lading had to tell the client that so
3  that when he gets the bill of lading, he goes, he
4  knows what he is picking up and which contract he is
5  picking up for.
6      Q.   Okay. Maybe I will show you another
7  example from Hanni's deposition, and you can just
8  show me what it is. I am going to show you Exhibit
9  5 to the Hartmann deposition. Maybe you can just
10 point out to me, because I didn't know it was on
11 there.
12     A.   This is a nonnegotiable copy.
13     Q.   Okay, so on the ones that you have seen
14 in your files that are copies of an original bill of
15 lading --
16     A.   Yes.
17     Q.   You are looking through some of the
18 documents that you brought with you today?
19     A.   I am looking through the documents to
20 see where it would tell me where -- what shipment it
21 is for, and I don't see anything.
22     Q.   Okay. Well, getting back to Exhibit 2,
23 I think what you were telling me was that the first
24 -- there is approximately $160,000 that Hanni paid
25 between October 26th and December 9th that were all

Page 47

1  payments on one contract, is that what you are
2  saying that was for?
3      A.   The 84,000?
4      Q.   Well, there's the $84,000 check which
5  was an estimate, and then there was an additional
6  almost 80,000 paid in a series of wire transfers on
7  the same day on December 9, 2003, and I thought
8  your recollection was that that was all related to
9  one contract?
10     A.   I'm assuming if all of these invoices is
11 for the same contract.
12         MS. FARIAS: Can we take a short break?
13         MR. KUGLE: Sure.
14         (Recess was taken.)
15         MR. KUGLE: All right, let's go back on
16 the record.
17     Q.   (By Mr. Kugle) Ms. Matsumura, we were
18 looking at Exhibit 2, and we were all having a
19 little difficulty understanding what exactly was
20 happening, and I think the reason is because there
21 had been a number of payments shown on this made to
22 Maersk by Hartmann Metals that didn't tie directly
23 to a specific invoice amount, right?
24     A.   Right.
25     Q.   And, actually, that's why you ended up

Page 48

1  having to make some handwritten notes on this where
2  you were numbering certain invoices and then
3  numbering certain payments trying to track the ones
4  that correlated directly versus other ones that were
5  just kind of round sums?
6      A.   Right.
7      Q.   Speaking of round sums, as I look down
8  at the payments made, there's a round sum, for
9  instance, the second one there of $25,000, a nice
10 round sum, and then there's others for some
11 extremely odd broken up numbers. Did Mr. Hartmann
12 ever explain to you why those were not round numbers
13 but very precise down to the --
14     A.   No.
15     Q.   -- 82 cents?
16     A.   No.
17     Q.   Now, why don't you walk me through the
18 handwritten notations and what you were explaining
19 to Andrea Jinks as you made those? And maybe we can
20 start with the first invoice amount, and you have a
21 handwritten notation in the line next to it, $416?
22     A.   I don't remember.
23     Q.   Okay. Proceeding down, you have a
24 series of check marks on the invoice numbers on the
25 first six lines. Do you recall what those checks

Page 49

1  were for?
2      A.   Where?
3      Q.   As you look down in the invoice columns.
4      A.   The invoice columns.
5      Q.   The invoice amount, the first six
6  entries, $17,405 on down to $29,915, you have check
7  marks next to the numbers. Why were you putting
8  check marks there?
9      A.   I don't remember.
10     Q.   Okay, and then you get to the next line
11 down on the invoice, the invoice amount being
12 $6,430, and you have a seven next to it, correct?
13     A.   Yes.
14     Q.   And what does that seven signify?
15     A.   It's under the invoice.
16     Q.   Okay.
17     A.   It tells me that it matches the
18 agreement on December 9th for $6,430.
19     Q.   Okay, I see that. All right, how about
20 the next entry which is the invoice line for
21 December 3rd, 2003, invoice number 2009, the last
22 four digits, the invoice amount is $8,565, and then
23 you have a handwritten number of $8,579.81 next to
24 it. What is that?
25     A.   Eight five seven nine eight one is what

Page 50

1  Andrea told me. The difference that we figured out
2  was the original dock fees for one four eight one.
3    Q.  Okay. So $14.81 is the difference
4  between those two numbers?
5    A.  Right.
6    Q.  And that's related to - --
7    A.  Original dock fees.
8    Q.  -- original dock fees or origin dock
9  fees, perhaps?
10   A.  Yeah, okay.
11   Q.  Okay, and so were you and Andrea saying
12 that Hartmann Metals should pay the lower number or
13 the higher number?
14   A.  Neither. It just tells me that that's
15 the difference.
16   Q.  Okay, and was either number paid by
17 Hartmann Metals?
18   A.  The eight five six five.
19   Q.  And how do you know that was paid?
20   A.  Because of the difference. When you
21 total up all the invoices and you total up all the
22 payments, the difference is 18,875.36 which was the
23 check that was sent to Maersk --
24   Q.  Okay.
25   A.  -- to clear the account.

Page 51

1    Q.  So if I could make, I guess, a
2  generalization about your methodology, you took a
3  series of invoices over a four-month period of time
4  and a series of payments over that same period of
5  time, late 2003 to early 2004, added each of them
6  up, came up with a difference, and that was how you
7  determined that Hartmann Metals should pay Maersk
8  $18,875.36?
9    A.  Right.
10   Q.  Okay.
11   A.  Which was paid.
12   Q.  Which was paid, that's right, and then
13 it was ultimately rejected also, were you aware of
14 that?
15   A.  It was returned.
16   Q.  Okay. So I understand your methodology,
17 now, that methodology in this analysis would not
18 work if there were invoices prior to October 28,
19 2003, correct?
20   A.  I don't understand.
21   Q.  Well, in other words, if there was a
22 prior history of transactions and payments and if it
23 wasn't zeroed out on October 28th, 2003, then this
24 analysis would be flawed?
25   A.  But then we would have gotten -- Andrea

Page 52

1  would have told me at that point that there was a
2  balance from someplace else. That's why we went
3  line by line to come up with a balance, current
4  balance at that time, so that tells me there was no
5  balance outstanding prior to this.
6    Q.  Okay. Continuing down this list --
7       Well, let me just follow up on that. If
8  there had been an outstanding balance, again, this
9  wouldn't work, correct, because it would have
10 omitted more numbers?
11   A.  Not according to our records because I
12 would have zeroed it out.
13   Q.  Okay. The next line that we are looking
14 at going down the invoice column is dated December
15 10, 2003, invoice number 2034, with the invoice
16 amount 2,160, and you have a five next to that.
17   A.  Right.
18   Q.  What is the reason for the five?
19   A.  The five signifies that the wire
20 transfer on December 22nd for 2,160 was made to
21 clear that invoice.
22   Q.  Okay, direct correlation between those
23 two?
24   A.  Right.
25   Q.  Okay. The next one on the list, the

Page 53

1  invoice amount 17,105, and it has a six next to it?
2    A.  Same thing, December 22nd, 17,105.
3    Q.  Okay. The next line down which is an
4  invoice amount of 23,510, you have a four next to
5  it?
6    A.  December 31st was a wire transfer of
7  23,510.
8    Q.  Okay, and so on down the list for your
9  numbered ones, correct?
10   A.  Right.
11   Q.  You lined them up. Now, I wanted to
12 ask, there are some more handwritten notations as we
13 get down to the last three invoices, it looks like,
14 or at least they are in the margin next to those,
15 and those are the invoices where you have the words
16 copy attached. For invoice number, the last four
17 digits 1026, you show an invoice amount of $27,395.
18 Are the handwritten comments on the margin related
19 to that?
20   A.  Yes. The storage amount, thirteen four
21 one two point three two, is related to that invoice.
22   Q.  So you are saying that --
23   A.  That's what Andrea says her number
24 consists of.
25   Q.  Okay. So Andrea is saying that in

Page 66

1  that you were served with, correct?
2  A. Yes.
3  Q. Okay, and why don't you tell me what
4  this is? Did you prepare this?
5  A. Yes. It's just brief notes to myself --
6  Q. Okay.
7  A. -- after our meeting as to what the --
8  what's the word? The differences or the -- yes, the
9  differences in the lawsuit or whatever you want to
10 call it.
11 Q. Okay. This is your notes of a
12 conversation that you had with Ms. Farias and
13 Mr. Hartmann in which you were discussing the
14 amounts in dispute in this case?
15 A. That's the word, amount in dispute.
16 Q. Okay. Now, I want to focus on the line
17 portion at this time, the line portion of the page.
18 You say, number one, Roman Numeral one, you have a
19 bill of lading number, correct?
20 A. Right.
21 Q. The last four digits of which are 2009,
22 and then you have an amount next to it. Is that
23 supposed to be the amount that is claimed to be
24 owed?
25 A. Yes.

Page 67

1  Q. Okay, $8,565.
2  A. Yes.
3  Q. Is that part your handwriting, the Roman
4  Numeral, the bill of lading number and --
5  A. The whole sheet is my handwriting.
6  Q. I'm sorry?
7  A. The whole sheet is my handwriting.
8  Q. The whole sheet, okay, okay, and then
9  next to that you have a check mark and a word that I
10 can't read. What does that say?
11 A. It says okay.
12 Q. All right, and what does that mean?
13 A. It means that the 18,000 that was
14 returned was to pay this, so.
15 Q. Okay. So in other words, you looked at
16 it. Did somebody tell you to put okay, or does that
17 mean that you looked at it, and you determined that
18 the $18,000 wire transfer that had attempted to be
19 made covered or included this amount?
20 A. Included that amount, yes.
21 Q. How did you determine that the 18,000
22 included this amount?
23 A. Because if you look at each item that
24 your dispute is about, I can just -- I can tell
25 where the 18,000 came from that you say is part of

Page 68

1  this that was returned. Item one, the $18,565 and
2  item three, part of item three, the $10,310.36 for
3  freight makes up the $18,875.36 that you returned to
4  the store.
5  Q. Okay. So I think then what you are
6  saying is that if you set this page next to Exhibit
7  2, well, let's use Exhibit 3, your e-mail, which was
8  your more current run of numbers, right?
9  A. Right.
10 Q. Okay.
11 A. Oh, I can't write on that. Sorry.
12 Q. Okay. Looking at Exhibit 3 to your
13 deposition, your June 2 e-mail, if you go down and
14 you find this first bill of lading number, which the
15 last four digits numbers are 2009, you show that as
16 being an invoice dated December 3, 2003, and then
17 you have the same dollar amount, $8,565, so you are
18 saying that you are concluding that that had not
19 been paid in December or January, February, or March
20 until that April $18,000 wire was being made?
21 A. I don't understand.
22 Q. Well, I think what you are saying in the
23 summary sheet we are looking at that's Exhibit 4,
24 right, you are saying that you went through all the
25 disputed amounts, and you tried to analyze them and

Page 69

1  to decide what these numbers are, and were they paid
2  or not paid, is it a proper claim or not --
3  A. Right.
4  Q. -- that was what you were attempting to
5  do, and so you said that as you looked at these
6  numbers that were in dispute, you had determined
7  that bill of lading number 2009, the $8,565 had been
8  paid when Hartmann Metals made the $18,000,
9  $18,875.36 wire transfer in April?
10 A. Right.
11 Q. So what I am saying is how did you
12 determine that prior to April this invoice, which
13 was dated December 3, 2003, hadn't been paid?
14 A. I didn't. You're telling me now what
15 invoice you marked off.
16 Q. Well, I am not understanding what you
17 were asked to do.
18 A. No.
19 Q. I mean, you calculated the sum of
20 $18,875.36?
21 A. Right.
22 Q. And you have determined that that
23 included --
24     You said to Hanni this is how much you
25 haven't paid and that you should pay Maersk to

18 (Pages 66 to 69)

Page 70

1  balance out your account?
2     A.   Right.
3     Q.   And I am simply saying what was that
4  $18,000 comprised of, what invoices, and I think you
5  have identified in Exhibit 4 that it applies to two
6  different invoices, correct?
7     A.   Correct.
8     Q.   I guess my question is you could only
9  figure out that it was these two invoices that
10 hadn't been paid at the time they were sent by
11 Maersk only by kind of backing all of this
12 information out, right, a hindsight kind of
13 analysis?
14    A.   Right.
15    Q.   Were you able to determine why that
16 invoice hadn't been paid back in December?  And when
17 I say that invoice I am referring to 2009.
18    A.   I don't know.
19    Q.   Okay.  Continuing on Exhibit 4, the next
20 one you have, Roman Numeral two, you are talking
21 about invoice number 2109, which is an amount owed
22 that Maersk is claiming of $23,814.09, and you used
23 the term demurrage.  Earlier you had written
24 storage.  Is that the same thing?
25    A.   It's the same thing.

Page 71

1     Q.   Okay, and so as you are looking at this
2  doing your analysis, you are agreeing that that
3  amount has never been paid by Hartmann Metals,
4  right?
5     A.   It is not even recorded.
6     Q.   Right, because you believe that Hartmann
7  Metals took the position that it wasn't owed?
8     A.   Right.
9     Q.   Now, dropping down to Roman Numeral
10 three which is invoice number 1026, you have here a
11 total sum claimed of $40,807.37, and then you have
12 that broken down into two separate amounts, correct?
13    A.   Right.
14    Q.   Of that you determined that there was
15 $10,310.36 and $30,497.01 in demurrage or storage,
16 right?
17    A.   Right.
18    Q.   And so your analysis concluded that the
19 original freight portion of 10,000 and some dollars
20 had not been paid when the invoice was sent but had
21 in fact been then covered by the April wire transfer
22 of $18,875.36 --
23    A.   Yes.
24    Q.   -- right?  I'm sorry, we both spoke at
25 the same time.  That was right?

Page 72

1     A.   Yes.
2     Q.   Okay, and then you concluded that the
3  balance of that $30,497.01 was for the storage that
4  Hartmann Metals contended it did not owe?
5     A.   Right.
6     Q.   Okay.  In doing this analysis, were you
7  able to determine why the original $10,000 or so of
8  freight hadn't been paid back in January when it was
9  incurred?
10    A.   I don't know.
11    Q.   Okay.  Dropping down on Exhibit 4 to
12 Roman Numeral four, you have bill of lading number
13 4274, and then you have circled the $750 rate
14 change.  This is the sum that we have looked at
15 before which was the difference between what Maersk
16 had invoiced at $11,000 and some change and what
17 Hartmann had paid at 10,000 and some; is that
18 correct?
19    A.   Right.
20    Q.   Were you attempting to determine whether
21 that number should or shouldn't have been paid, or
22 are you just simply attempting to identify the
23 number?
24    A.   I am simply attempting to identify.
25    Q.   Okay.  Now, the last two items you have,

Page 73

1  Roman Numerals four and five, are two bills of
2  lading numbers 6108 and 5563, and your notation, if
3  I read that correctly, says Alliance paid.  Is that
4  what you are saying?
5     A.   Yes.
6     Q.   Did you understand whether Maersk was
7  claiming that it was owed those sums?
8     A.   Yes, Maersk is saying that Hartmann owes
9  $2,661 and the $2,825, that Mr. Hartmann owes Maersk
10 this money, but Alliance already paid Maersk for
11 this money for these two bills of lading.
12    Q.   Okay.  The information that you were
13 given that you then put on this section of Exhibit
14 4, were you looking at papers, or were you simply
15 being told that by Mr. Hartmann and Ms. Farias about
16 what Maersk was claiming was owed?
17    A.   There's one, two, three, four, five,
18 six, seven?
19    Q.   Yes.
20    A.   That's what he said.
21    Q.   Okay, all right.  You were looking at a
22 piece of paper?
23    A.   Yes.
24    Q.   Okay.
25    A.   He has --

Page 78

1  you wrote it all down, and then you were trying to
2  figure out the difference between what was
3  originally invoiced and then what appeared on a
4  subsequent bill of lading; is that right?
5      A.   Or what they said.
6      Q.   Okay, and then the 17,420 that appears
7  on page eleven of Exhibit 5 is the same number that
8  you carried over into your summary sheet, Exhibit 3,
9  which is the June 2, 2004, e-mail, right?
10     A.   Right.
11     Q.   Okay. Then the remainder of these
12 charges that you have written down here are the ones
13 that you had indicated in that June 2 e-mail that
14 Hartmann should not be responsible for, correct?  In
15 other words, on the second page of your June 2
16 e-mail, that statement that --
17     A.   Okay.
18     Q.   -- Hartmann shouldn't be responsible for
19 storage and change of destination fees, that's
20 referring to these handwritten notes?
21     A.   Because the OBL was late.
22     Q.   Yes.
23     A.   Yes.
24     Q.   Okay, now, turn to page 13.  Now, this
25 is a bill of lading, and this is actually something

Page 79

1  different, right?  This is a nonnegotiable copy, or
2  at least that's what it says, right?  Do you
3  understand that that's something different?
4      A.   Yes.
5      Q.   Okay.  My only question really is that
6  this one here has a bill of lading number.  The last
7  four digits are 6736.  That does appear on your
8  list --
9      A.   Right.
10     Q.   -- but it also has a balance due, at
11 least showing on this bill, correct?
12     A.   Yes.
13     Q.   Now, this was for transportation that
14 had been provided prior to -- strike that.
15          I guess what I don't understand is I
16 don't see where this balance due shows up on your
17 accounting.
18     A.   It doesn't.  This is part of the --
19 $17,405 is what I recorded, and that's what I got at
20 that time.  This nonnegotiable copy is different
21 numbers from what I had originally.
22     Q.   Okay.  So the original one came in at a
23 round number, you are saying, of $17,405 and no
24 change, and then this one comes in at $17,419.82; is
25 that right?

Page 80

1      A.   Yes.  Is that HKD or Hong Kong dollars?
2  I guess that's what that means.  That's in that same
3  box.
4      Q.   Well, let me ask you, to the left of the
5  $17,000 number is USD meaning United States dollars,
6  correct?
7      A.   Oh, okay, yes.
8      Q.   The HKD, if you read along in the fine
9  print, there are numbers that appear there.
10     A.   Oh, okay.
11     Q.   So do you think that the HKD is
12 referring to items in that long list?
13     A.   I don't know.
14     Q.   You know, the funny thing that I noticed
15 about your charts, either Exhibit 2 or Exhibit 3,
16 whichever one you look at, is the frequency with
17 which 82 cents seems to appear, and I am wondering,
18 I mean, there is one invoice, which is not this
19 invoice, and it's 6764 where the invoiced amount
20 ends in 82 cents, but then there are three payments
21 that are made where the invoice amount ends in 82
22 cents.  Are some of these payments trying to make up
23 for --
24     A.   I don't know.
25     Q.   -- this bill that we are looking at,

Page 81

1  page 13?
2      A.   I don't know.
3      Q.   Okay.
4      A.   He makes the payments.
5      Q.   The answer to that is you have no idea
6  how those payment numbers were derived?
7      A.   Right.
8      Q.   Simply that they were made, correct?
9      A.   Yes.
10     Q.   Okay.  Look at page fifteen of Exhibit
11 5.  This is the one that you were describing to me
12 before where there was a difference in the freight
13 rates of approximately $750, right?
14     A.   Right.
15     Q.   And your analysis determined that
16 Hartmann Metals had paid?
17     A.   $10,775.
18     Q.   Okay, and that Maersk was claiming that
19 it was owed the entire amount that appears on page
20 fifteen, in other words, $11,525?
21     A.   Right.
22     Q.   Okay, and you didn't attempt to
23 determine which one was correct, just identify the
24 difference; is that right?
25     A.   On that page fifteen, the rate is

21 (Pages 78 to 81)

Page 82

1  circled, and this paid 10,000 note on the bottom is
2  Mr. Hartmann's writing.
3      Q.   Did you and Mr. Hartmann talk about what
4  that meant?
5      A.   Wrong rate.
6      Q.   Okay, he told you that they were simply
7  using the wrong rate in this bill, page fifteen?
8      A.   Yes.
9      Q.   On page seven is that --
10     A.   Same.
11     Q.   -- your handwritten changes, or is that
12 Mr. Hartmann's?
13     A.   That's my changes.
14     Q.   Okay, and he had told you that they had
15 used wrong numbers here?
16     A.   Right.
17     Q.   Turn to page nineteen, handwritten
18 comments at the top have what looks like a date
19 12-19, and below it it says paid Dora. Are those
20 your notes or Mr. Hartmann's?
21     A.   That's Mr. Hartmann's, that's his note
22 to me.
23     Q.   His note to you telling you that this
24 one was paid on December 19, is that what that
25 means?

Page 83

1      A.   Yes.
2      Q.   Okay. I was going to say I hope we
3  could look right at one of your lists- --
4      A.   Yes.
5      Q.   -- but we can't.
6      A.   No.
7      Q.   Okay, why can't we?
8      A.   Because it's part of the December 9th
9  wire transfers.
10     Q.   Okay. So there's that series of wire
11 transfers that didn't correspond precisely to an
12 invoice amount, and you are saying that this one
13 here that we are looking at, bill of lading number
14 9933, was buried somehow within those various wire
15 transfers?
16     A.   Right.
17     Q.   Turn to page 21. I would guess that's
18 the same thing?
19     A.   Right.
20     Q.   Page 23, again, the same thing?
21     A.   Right.
22     Q.   In part of your work, did you attempt to
23 go through and total up those invoices that we just
24 looked at to make sure that all of these paid wire
25 sums equaled the freight invoices that you had been

Page 84

1  sent?
2      A.   I don't understand.
3      Q.   Well --
4      A.   I totalled all the invoices and all the
5  wire transfers, and they come out zero, so to me
6  they were all paid.
7      Q.   Okay. I was saying in your analysis,
8  and I guess the best one to look at for that might
9  be Exhibit 2 because there you tried to trace the
10 ones that directly correspond versus the lump sum.
11 All I am saying is- --
12     A.   That it --
13     Q.   -- did you go through and set aside the
14 ones that directly correspond and then set in front
15 of you the invoices and the payment sums and --
16     A.   I couldn't.
17     Q.   Okay, and why couldn't you?
18     A.   Because on this, for example, an invoice
19 -- I mean a paid amount for the exact invoice.
20 Other than that, I don't know which invoices he
21 combined to pay off.
22          MR. KUGLE: Okay. Why don't we take a
23 break now, and let's go off the record.
24          (Discussion off the record.)
25          MR. KUGLE: All right, let's go back on

Page 85

1  the record.
2      Q.   (By Mr. Kugle) Ms. Matsumura, you were
3  telling us earlier in the morning about sometimes,
4  but not always, Hartmann Metals would use Alliance
5  to make payments to Maersk; is that right?
6      A.   What?
7      Q.   I'm sorry. I guess I want to understand
8  how Alliance fits in and whether from your
9  bookkeeping perspective you are distinguishing
10 between payments that are made to Alliance versus
11 payments that are made to Maersk?
12     A.   Alliance is another vendor.
13     Q.   Okay, but in effect Hartmann Metals is
14 paying Alliance with the expectation that Alliance
15 then makes the payment to Maersk, right?
16     A.   I don't know.
17     Q.   You don't know. None of the payments
18 that we were looking at on your summary, Exhibit 2
19 or Exhibit 4, those were all payments made directly
20 to Maersk and not to Alliance, correct?
21     A.   Correct.
22     Q.   Now, I was a little confused, I think,
23 when we were looking at Exhibit 3, if you can get
24 that one in front of you. I was trying to
25 understand why you picked this point in time,

22 (Pages 82 to 85)

 

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAERSK INC., | ) | CIVIL NO. CV 04-00652 (HG/BMK) |
| | ) | (In Admiralty) |
| Plaintiff, | ) | |
| | ) | **CERTIFICATE OF** |
| vs. | ) | **COMPLIANCE** |
| | ) | |
| HARTMANN METALS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to L.R. 7.5(e), the attached SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT is proportionately spaced, has a typeface of 14 points or more and, according to WordPerfect 11's "Properties" feature, contains 1,185 words.

DATED: Honolulu, Hawaii, January 17, 2006.

DAMON KEY LEONG KUPCHAK HASTERT

_____
GREGORY W. KUGLE
JAMESNER A. DUMLAO

Attorneys for Plaintiff
MAERSK INC.




UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MAERSK INC., ) | CIVIL NO. CV 04-00652 (HG/BMK) |
| ) | (In Admiralty) |
| Plaintiff, ) | |
| ) | **CERTIFICATE OF SERVICE** |
| vs. ) | |
| ) | |
| HARTMANN METALS ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date a true and correct copy of the foregoing document was duly served upon the following individual via hand delivery, to their last known address as follows:

CYNTHIA A. FARIAS, ESQ.
Dillingham Transportation Building
701 Bishop Street
Honolulu, Hawai`i 96813
Attorney for Defendant
  HARTMANN METALS CORPORATION

DATED: Honolulu, Hawaii, January 17, 2006.

DAMON KEY LEONG KUPCHAK HASTERT

_____
GREGORY W. KUGLE
JAMESNER A. DUMLAO

Attorneys for Plaintiff
MAERSK INC.