IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAERSK, INC. | ) | CIVIL NO. CV04-00652(HG/BMK) |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | DECLARATION OF HANNI HARTMANN |
| HARTMANN METALS CORPORATION, | ) ) | |
| Defendants. | ) ) ) ) ) ) | |

## DECLARATION OF HANNI HARTMANN

I, Hanni Hartmann, hereby declare upon information and belief as follows:

1. I am the President of Hartmann Metals Corporation ("HMC"), a Hawaii corporation in the business of exporting scrap metal.

2. HMC purchases scrap metal from vendors in Hawaii, the mainland United States and Europe and sells the metal to purchasers primarily in Asia.

3. As such, I have had extensive experience arranging shipment of scrap metal and transacting with shipping companies such as Maersk.

4. Over the past 4 years, HMC hired Maersk on numerous occasions to ship containers of scrap metal to various ports, including Hong Kong and Shanghai. HMC paid Maersk over $300,000 in freight and related charges.

5. In my experience, the usual procedure is that HMC as shipper pays the freight charges "up front", i.e. either before the cargo is loaded on the vessel, or while the cargo is in transit. When the cargo arrives at its destination, the consignee

picks up the cargo and pays any additional charges. The cargo is not released to the consignee unless all charges are paid in full.

6. In December of 2004, HMC contracted with Maersk for two shipments of scrap metal under Bills of Lading SJ1D42109 and SJ1D321026. The cargo was sold to the same consignee, but for reasons beyond HMC's control the shipment was split.

7. Prior to or at the time the cargo was discharged in Hong Kong on January 12, 2004, HMC received a request from the consignee, Jade Alliance, to divert the cargo to a port at Chiwan. The diversion charges were Jade Alliance's responsibility. However, Maersk made it clear that because HMC was the shipper, the request had to come from HMC. Maersk then made specific requests that HMC pay a $100 per container late declaration charge plus a $200 diversion fee per shipment, to which HMC agreed. However, at one point, HMC received another diversion request from the consignee, who wanted the shipment diverted to Hong Kong.

8. In order for the consignee to claim the cargo, it needed Original Bills of Lading which are generated by Maersk. HMC was having difficulty obtaining the Original Bills of Lading from Maersk. This caused delays which no doubt added to the demurrage and other charges.

9. The delays and confusion also created a lot of frustration between the parties. I had numerous telephone and email conversations with Maersk representatives, including Carlos Sullivan and Pam Lake, concerning the situation. Ms. Lake relayed Maersk's position that all additional fees, including demurrage and diversion, would need to be accepted by HMC before the cargo could be processed for

release to the consignee.

10. My understanding was that I, on behalf of HMC, was accepting the charges only because Maersk was demanding that HMC as shipper of record accept responsibility for the payments before it would process the diversion request. HMC had no choice but to accept in order to obtain the Original Bills of Lading. However, HMC operated with a complete understanding that Maersk would inform Jade Alliance of all additional charges and collect the monies from the consignee before releasing the cargo. In my experience, this is the normal and customary procedure for shipments worldwide. I did not expect and had no reason to believe that Maersk would release the cargo to the consignee without full payment.

11. If Maersk had advised HMC of the charges immediately prior to release of the cargo in Hong Kong, HMC could have made sure that the consignee pay all outstanding sums. In releasing the containers to Jade Alliance without full payment, Maersk deprived HMC of the ability to insure that the consignee paid the charges for which it was responsible.

12. HMC was unaware that there were any unpaid sums on these two Bills of Lading until months later. In May of 2004, HMC received a correspondence from Maersk demanding payment of additional fees and expenses in the total amount of $74,852.41 and I was surprised to learn that Maersk was attempting to collect monies in addition to the normal freight charges, which HMC already paid.

13. In June of 2004, there was a lot of communication between Maersk, HMC and Ms. Matsumura concerning these charges. HMC was having great difficulty obtaining a breakdown of the charges Maersk said was owed. Ms.

Matsumura, at my request, took a look at all invoices received from Maersk and compared it with payments made. She advised me that HMC owed Maersk a balance of $18,875.36, which HMC then tendered to Maersk via electronic transfer from Bank of Hawaii. However, the monies were returned.

14.     Ms. Matsumura and Andrea Jinks of the Maersk finance department spent substantial time attempting to straighten out the confusion. At one point, Ms. Jinks informed Ms. Matsumura that HMC was not responsible for the additional fees. HMC relied upon the representation of Ms. Jinks on this matter as it appeared she confirmed HMC's position on this issue.

15.     However, Maersk continued to seek collection of the monies through different personnel. This enhanced HMC's impression that a lot of confusion existed in the Maersk organization. Another major problem at this time was that HMC was given inconsistent messages from Maersk and not provided with a breakdown of the charges. The Bills of Lading which were initially prepared by Maersk did not and could not reflect the diversion and demurrage charges. HMC operated under these Bills of Lading for at least 6 months. Despite repeated requests for documentation, HMC did not receive amended Invoices reflecting the additional charges until after Maersk's demand letter from attorney William De Voe in mid-July 2004. The demand letter sent by Mr. De Voe was also devoid of any specific breakdown of the additional expenses.

16.     The lack of proper documentation from Maersk caused joint confusion and delays.

17.     With respect to Bill of Lading No. SJ1D42009, HMC does not admit

4

that $8,565.00 is owed, and with respect to Bill of Lading No. SJ1D45274, HMC does not admit that $750 is owed. Maersk decided unilaterally what invoice to credit with payments, without cooperation with HMC or Mr. Matsumura. Moreover, Maersk's list of outstanding invoices varied from time to time.

18. Attached hereto as Exhibit "A" is a true and correct copy of the invoice dated July 24, 2004 which HMC received from Maersk

19. Attached hereto as Exhibit "B" is an email receipt from Bank of Hawaii concerning payment of $18,875.36 on 4/8/04.

20. Attached hereto as Exhibit "C" is a true and correct copy of the Non Negotiable Freight Invoice for Bill of Lading SJ1D42109 which HMC did not receive until some time after August 1, 2004.

21. Attached hereto as Exhibit "D" is a true and correct copy of the Non Negotiable Freight Invoice for Bill of Lading SJ1D321026 which HMC did not receive until some time after August 1, 2004.

22.. Attached hereto as Exhibit "E" is a true and correct copy of an email I received from Carlos Sullivan of Maersk dated January 16, 2004 concerning payment for diversion charges.

23.. Attached hereto as Exhibit "F" is a true and correct copy of a "Notepad" excerpt from MAERSK.

24. Attached hereto as Exhibit "G" is a true and correct copy of an email dated June 2, 2004 between HMC's bookkeeper Dora Matsumura and Sherry Potter-Ridlon of Maersk.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY INFORMATION AND BELIEF.

DATED:   Honolulu, Hawaii, February 6, 2006.

_____
HANNI HARTMANN